2006 VT 45

**In re J.F., K.F., K.F., and J.F., Juveniles**

[904 A.2d 1209]

No. 05-539

¶ 1. June 5, 2006. The Department for Children and Families (DCF) appeals the family court's November 9, 2005 order denying DCF's petition to terminate the residual parental rights of mother and father with respect to the four youngest of their seven children. The eldest of the four children who are subject to the family court's order joins the brief filed by the parents, while the other three children join the brief filed by DCF. We reverse the family court's order based on our determination that the court's findings and conclusions, which are supported by the evidence, mandate termination of parental rights in this case.

¶ 2. None of the parties challenge any of the trial court's findings, which detail a long history of child neglect and defiance of court orders by the parents in this case. The children subject to the order on appeal are: Ja.F., born May 8, 1995; Je.F., born November 1, 1996; Ke.F., born May 29, 1998; and Ka.F., born July 19, 2000. The parents' three oldest children, who are not subject to the order on appeal, were born in April 1989, January 1992, and August 1993. The parents were originally from New Hampshire. In October 1999, New Hampshire social services officials began investigating allegations of educational and medical neglect concerning the family. The investigation revealed that the school-aged children were not enrolled in the public school system and had not been properly registered for home schooling. During the investigation, the socially isolating practices of the parents became evident. The children were rarely seen outside the family's apartment, the blinds were drawn during the day, and lights were often off in the apartment during the evening. Issues of medical neglect also arose from the New Hampshire investigation. The children were small and underweight, and did not have all of the required immunizations; yet, the parents were reluctant to bring the children to a clinic to address their various medical issues. In February 2001, the children's pediatrician reported a suspected failure to thrive regarding Ka.F. The parents resisted efforts by authorities to address the problem and then moved to Vermont in the summer of 2001.

¶ 3. The family was living in various places, including in their van, throughout the fall of 2001, when police received a report of the parents' suspected noncompliance with state education laws. The report was confirmed, and DCF filed a petition alleging that the children were in need of care or supervision (CHINS) because of the parents' educational neglect. The petition also alleged that the children were socially isolated and had been involved with New Hampshire social services due to issues of educational and medical neglect. At a preliminary hearing, the family court issued a protective order requiring the parents either to enroll their children in public school or to provide documentation that the children were properly registered for home schooling. Shortly thereafter, the parents decided that they wanted to return to New Hampshire. In January 2002, the court approved the move subject to a protective order requiring the parents to keep DCF informed of their whereabouts and to satisfy the court that the children's educational and medical needs were being met in New Hampshire. The parents did not comply with the order, and a warrant was issued for father's arrest after he failed to appear for a hearing. DCF filed a renewed CHINS petition with respect to the youngest

three children, and all seven children were ordered to be taken into state custody.

¶ 4. The family then disappeared for six months. Eventually, they were found living in their van in Massachusetts. Father was arrested and the children were taken into custody. The children were thin and appeared much smaller and younger than their ages. A medical examination revealed that one of the children was emaciated and another had a heart murmur. Seven-year-old Ja.F. and five-year-old Je.F. were not toilet trained. In September 2002, custody of the youngest three children was transferred back to mother, and the four older children were placed in foster care. In the fall of 2002, after father returned from a month in jail for violating the protective order, the family lived in a series of motels. The parents refused to cooperate with DCF and school officials regarding the children's attendance at school. Assimilating the children into the school system was further complicated by the children's lack of any social skills to help them interact with adults and peers.

¶ 5. In November 2002, the parents stipulated that all seven children were in need of care and supervision because they had been educationally neglected and socially isolated to their detriment. The children were placed in a foster home, but it did not work out, in part because the parents encouraged the children not to cooperate with their foster parents. In December 2002, the family court approved a reunification plan and allowed the parents to move back to New Hampshire with the children. In New Hampshire, the parents again defied the family court's protective order regarding school attendance. The parents also continued their socially isolating behaviors by keeping the children out of school, rarely allowing them outside, and papering over the windows of their home.

When officials attempted to intervene, the family moved.

¶ 6. In January 2003, the police located the family at a hotel. Father was arrested on a contempt-of-court charge. Mother was arrested for resisting arrest, child endangerment, and assaulting a police officer. There was evidence of medical neglect. The feet of the youngest children were green and their nails were so overgrown that they had begun to curl under their feet. The family court ordered all seven children back into DCF custody. Pursuant to the Interstate Compact on Placement of Children, the children were placed in foster care in New Hampshire. Foster care was extremely difficult for the older children, two of whom were eventually placed at a therapeutic children's home. The three younger children had less difficulty making the transition to their respective foster homes, but they displayed bizarre behavior concerning bathing and eating.

¶ 7. In November 2003, DCF filed an updated disposition report recommending termination of parental rights with respect to all seven children. The parents moved back to Vermont sometime in the fall of 2003. Within a couple of months, they found an apartment, and father got a job as a security guard. In January 2004, the court granted the parents' motion for custody and guardianship of the three older children, but required the parents to engage in therapy, participate in parent education, and cooperate with school officials regarding the attendance and participation of the children in the public school system. The court made the return of the fourth child, Ja.F., to his parents' custody contingent on their compliance with the terms of the protective order. The three youngest children, who remained in foster care in New Hampshire, made progress during this period but exhibited troubling behaviors following contact with their parents. The parents enrolled the three older children

in public school, but did not consistently cooperate with DCF or school officials. Father also failed to inform DCF when he was fired from his job, and later falsely represented to DCF that he was still employed.

¶ 8. On July 16, 2004, DCF withdrew its request for termination of parental rights with respect to the three oldest children. Hearings on DCF's termination petition regarding the other four children were held over eight days. Following the hearings, the family court denied DCF's petition to terminate the parents' residual parental rights. Instead, the court maintained prior placement and protective orders, and allowed supervised visitation. DCF appeals, arguing that the family court's findings do not support its conclusion that long-term foster care rather than termination of parental rights is in the children's best interests. The parents respond that the family court did not order long-term foster care but rather maintained the status quo, which was within the court's discretion, given the strong bond between the children and the parents. Ja.F. joins the parents' brief, but his guardian ad litem does not agree with the parents' position. The three younger children join the brief filed by the State.

¶ 9. Before examining the family court's order, we acknowledge some basic principles concerning child neglect cases. Because of the natural affinity between children and their parents, children should be separated from their families "'only when necessary for [their] welfare or in the interests of public safety.'" *In re A.G.*, 2004 VT 125, ¶ 17, 178 Vt. 7, 868 A.2d 692 (quoting 33 V.S.A. § 5501(a)(3)). Nevertheless, CHINS proceedings "are protective in nature and focus on the welfare of the child, the child's safety and permanency being the paramount concern." *Id.* (citing 33 V.S.A. § 5501(a)(1) & (4)). The party seeking modification of a prior court-approved goal bears the burden of demonstrating that there are material and changed circumstances, and that the best interests of the children, considering the criteria set forth in 33 V.S.A. § 5540, require the desired modification. *Id.* "The decision on modification will be upheld if the findings are not clearly erroneous and the conclusions are supported by the findings." *Id.*

¶ 10. In this case, no party has challenged any of the family court's findings. Nor has any party challenged the court's conclusion that DCF met its burden of demonstrating by clear and convincing evidence a substantial change in material circumstances. Rather, DCF argues that, given the criteria set forth in § 5540 and the Legislature's strong policy demonstrating its preference for providing children permanency and stability, the family court's decision to deny the termination petition is not supported by the evidence or its own findings and conclusions concerning the children's best interests. We agree.

¶ 11. After documenting years of the parents' neglect and fundamental opposition to the children's participation in normal society, the family court denied DCF's termination petition, citing the parents' effort to find stability and the children's continued emotional attachment to the parents. The court noted that at the time of the final TPR hearing in April 2005, the parents had found housing, and father had found a job. The court also noted that one witness reported that the parents were cooperating with school officials concerning issues of education for the three older children. On the other hand, the court found that the parents had been evicted from their previous home in November 2004 for failing to pay rent, and that husband had violated a protective court order by failing to report to DCF that he had been fired from his previous job. The court also found that in August 2004 the parents had submitted

an application to home school their children, which the court found to be contrary to the protective order requiring the parents to have the children attend public school. The court further found that the parents were still not cooperating fully with school officials, were not maintaining contact with DCF, were not supporting their children in foster care, and were not following through with a court-ordered forensic evaluation. These latter findings, which have ample support in the record, demonstrate that the parents had made little if any progress in addressing the key issues that brought their children into DCF custody years earlier.

¶ 12. Nevertheless, the family court concluded that the parents' failure to obtain needed services, cooperate with DCF, or try to understand their children's needs did not warrant termination of parental rights because termination is not a tool to punish recalcitrant parents. Citing the children's continued bond with their parents, the court concluded that the drastic step of termination was not needed to prevent the unhealthy and unreasonable isolation of the children that had occurred, notwithstanding the parents' continued lack of insight and stubborn resistance to address their problems. Thus, the court elected to continue the status quo, concluding that "[p]erhaps long term foster care will be the proper solution."

¶ 13. Upon careful review of the record, we find no support for the family court's decision to deny DCF's termination petition and maintain the status quo. Rather, the evidence, as well as the court's findings and conclusions, overwhelmingly support the termination petition. As the family court found, despite years of DCF intervention, the parents continue to abide by practices that negatively impact their children's lives, demonstrating that they still do not have any insight into the harm that they

have caused. The court ruled out termination of parental rights because of the bond that exists between the parents and their children, but its own findings demonstrate unequivocally that the parents have manipulated that bond to prevent the children from overcoming serious problems stemming from years of parental neglect. Indeed, the evidence and findings in this case demonstrate that the bond between the parents and the children has fostered clannishness to an extreme and led directly to neglectful deficiencies in the children's health, education, and adaption to society in general. To be sure, in some cases a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate remedy, but in a case such as this, where the evidence and findings plainly demonstrate that the bond is destructive in nature and has greatly harmed the children, it was error for the court to rely on that bond to reject termination of parental rights as an option. See *In re M.B.*, 162 Vt. 229, 238, 647 A.2d 1001, 1006 (1994) ("Public policy ... does not dictate that the parent-child bond be maintained regardless of the cost to the child; 33 V.S.A. § 5540 recognizes that severance of that bond may be in the child's best interest.").

¶ 14. With respect to Ja.F., the family court described years of neglect and abuse, citing evidence that father physically abused the child and locked him in a closet to punish him. The court found that as late as August 2004 father engaged in "manipulative and cruel" behavior towards Ja.F. in an effort to win the child's loyalty and defy DCF. According to the court's findings, Ja.F.'s behavior got worse when his visits with his parents became more frequent. The court noted that Ja.F. displayed high anxiety about his future, and that visits with his parents exacerbated that anxiety. The court also found that the lack of

parental support and understanding exacerbated Ja.F's difficulty in foster care. As the court explained, the parents both overtly and subtly communicate their disapproval of any positive or enriching experiences that he has outside of their control. Consequently, Ja.F. does not feel that he can share his successes with his parents. The court concluded that the parents' attitude negatively affects Ja.F.'s emotional and psychological well-being, causing the ten-year-old child to worry about the future and engage in socially unacceptable behaviors.

¶ 15. The court's findings regarding Je.F., Ke.F., and Ka.F. have many similarities. Nine-year-old Je.F. has been in foster care in New Hampshire since January 2003. The court found that she has a connection with her biological family, but has thrived with her foster family. According to the court, the parents do not support her activities in foster care, and thus, like Ja.F., she is fearful of contradicting her parents by telling them of her successes.* The court concluded that

---

* As is the case with Ja.F., the court found that the younger children experienced "upset" following visits with the parents. The court concluded that the "upsets were unfortunate and are a high price to pay for continuing contact with the parents and siblings," but that "this upset often occurs in divorce and separation cases of families with children." In our view, the court's analogy to the unhappy lot of children caught up in their parents' separation and divorce seems wholly inapposite to the instant case, which concerns unfit parents found to have relentlessly harmed their children. See *In re S.B.*, 174 Vt. 427, 428, 800 A.2d 476, 478 (2002) (mem.) (case involving termination of parental rights "is not a custody case in which the family court is weighing which parent or guardian will

Je.F. needs to be in a family that will understand her past isolating experiences and acknowledge the progress that she has made in overcoming those experiences. The court found that returning Je.F. to her parents would require them first to recognize and support her experiences in foster care and public school; yet, the court also found that the parents are still unable to recognize Je.F.'s needs as distinct from their own. Thus, the court concluded that the parents remain unable to parent Je.F.

¶ 16. With respect to seven-year-old Ke.F. and five-year-old Ka.F., who also have been in foster care since January 2003, the family court found that they were integrated into a loving foster family that provided them the support they need. The court found that the children recognize their foster parents as their parents and have adjusted well to their community, school, and home. Nevertheless, notwithstanding the sense of security provided by the foster family, the children continue to demonstrate behaviors indicating that they suffer from uncertainty and a sense of impermanence because of the isolating, unstable, and unhealthy environment they endured while living with their parents. Hence, the court concluded that the children are in need of well-being that comes from the safety and stability of permanent relationships with nurturing care providers. According to the court, "[a]ny delay in satisfying this need is likely to place them at risk of serious social and emotional problems." Yet, the court denied DCF's termination petition even

---

be best able to serve the needs of the child," but rather is a legislatively created "proceeding in which the court is required to weigh specified statutory factors when determining whether to grant a petition for termination of residual parental rights").

though it found that the parents have still not cooperated with DCF to address their significant problems and continue to disavow having harmed the children.

¶ 17. These and other findings and conclusions made by the court overwhelmingly support granting DCF's termination petition with respect to all four children. In considering the best interests of children in the context of a modification proceeding, the court must consider the criteria set forth in 33 V.S.A. § 5540, including (1) the relationship of the children with their natural parents, their foster parents, and other persons significantly affecting their lives; (2) the children's adjustment to their home, school, and community; (3) the likelihood that the parents will be able to resume parental duties within a reasonable period of time; and (4) whether the natural parents play a constructive role in the children's welfare. The family court barely mentioned the third and most important factor — the likelihood that the parents would be able to resume parental duties within a reasonable period of time — yet the evidence and the court's own findings demonstrate that the parents will not be able to resume their parental duties within a reasonable period of time, given the children's years in foster care, their immediate need for permanence and stability, and the parents' continued denial of neglect and resistance to change. Denying the termination petition under these circumstances was clear error. See In re B.M., 165 Vt. 331, 337, 682 A.2d 477, 480 (1996) (reasonable period of time must be measured in term's of children's needs, with consideration of parents' prospective ability to care for children).

¶ 18. With respect to the youngest three children, all four factors militate heavily in favor of termination of parental rights. The court's findings and conclusions demonstrate that the parents severely neglected those children for years; that they continue to deny the neglect and persist in the beliefs and behavior that led to the neglect; that the children have formed important, loving bonds with their foster families and are in critical need of permanency and stability; that the parents cannot, and will not be able to, provide the needed permanency and stability because of their resistance to change and distrust of those trying to help the children; and that any existing bond between the children and the parents is more destructive than constructive in nature, as evidenced by the children's regression after visits with the parents.

¶ 19. Similarly, with respect to Ja.F., the evidence and the court's findings demonstrate that the parents will not be able to resume parental duties within a reasonable period of time because of their demonstrated inability or unwillingness to change throughout a period of years during which case plans called for reunification. See In re M.B., 162 Vt. at 235, 647 A.2d at 1004 (noting that most important of § 5540 criteria is whether parents will be able to resume parental duties with a reasonable period of time). By the same token, the evidence and the court's findings demonstrate that the parents have never played a constructive role in Ja.F.'s life. To the contrary, the evidence and findings indicate the opposite — that the parents have played, and continue to play, a destructive role in Ja.F.'s life, and that the child's relationship with his parents has hampered his progress toward attaining stability in his life. Thus, the third and fourth criteria weigh strongly in favor of termination.

¶ 20. Regarding the first and second criteria, Ja.F. has had much more difficulty in foster care than the younger children and has expressed a desire to return to his biological family. Thus, the first two factors concerning the child's relationships and adjustment to his home, school, and community are more

ambiguous as to which permanency placement is best for him. Nevertheless, as noted, none of the court's findings or conclusions indicate that the parents play any kind of a positive role in Ja.F.'s life or that they are making progress toward achieving that goal within a reasonable period of time. Further, the court's findings and conclusions demonstrate that Ja.F.'s difficulties and conflict concerning his placements stem from the parents' manipulative and controlling behavior, which has been a destructive force in the child's life. As with the other children, Ja.F. needs permanence and stability that cannot be provided by his parents, and thus termination of parental rights is necessary.

¶ 21. The record demonstrates that the parents have had ample time and opportunity to address the significant problems that led to their children being taken from them. But instead of making an effort to address those problems, the parents have denied having any problem, refused services, and engaged in a pattern of behavior that was harmful to their children. While children should not be separated from their natural parents unless it is necessary, the paramount concern is the child's safety and permanency. See *In re A.G.*, 2004 VT 125, ¶ 17. In recognition of this concern and the federal law promoting it, our Legislature has indicated that long-term foster care is the least desirable permanency option, available only if the court finds a compelling reason not to return the child home, terminate parental rights, or set up a legal guardianship. See 33 V.S.A. § 5531(d)(4); *In re A.G.*, 2004 VT 125, ¶¶ 45, 47 (Skoglund, J., dissenting) (given paramount concern for permanency, long-term foster care is least preferred disposition alternative because legal custodian can change foster placements, leading to foster-care drift).

¶ 22. We recognize that the family court did not formally order long-term foster care, but rather maintained all existing orders, stating only that "perhaps" long-term foster care would be the best solution. Nonetheless, the court's order denies permanency to children whom the court found to be in great need of permanency and stability, even though the record demonstrates that the parents will be unable to resume parental duties within a reasonable period of time, viewed from the perspective of the children. In this case, the court's decision to maintain the status quo does not follow from its findings, which overwhelmingly demonstrate that termination of parental rights is in the children's best interests.

*The family court's November 9, 2005 decision is reversed, and the petition of the Department for Children and Families seeking termination of residual parental rights with respect to Ja.F., Je.F., Ke.F., and Ka.F. is granted.*

Motion for reargument denied July 26, 2006.