*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2011-321

MARCH TERM, 2012

| | |
|---|---|
| In re C.P., Juvenile | }    APPEALED FROM: |

Superior Court, Chittenden Unit,
Family Division

DOCKET NO. 338-9-08 Cnjv

Trial Judge: Edward J. Cashman

In the above-entitled cause, the Clerk will enter:

Mother appeals termination of her parental rights to her daughter, C.P. On appeal, mother argues that the trial court misapprehended the importance of preserving the mother-child bond. We affirm.

The trial court found the following facts. C.P. was born in April 2003. At the time, mother and C.P. resided with the maternal grandparents. While in the grandparents' home, mother failed to provide for C.P.'s routine hygiene and maintain a clean environment. In August 2007, with mother's consent, the probate court appointed grandparents as guardians for C.P. The Department for Children and Families (DCF) recommend that mother begin mental health counseling and participate in child and family services. The parenting coach identified that C.P. needed consistent parenting and limit setting from mother. There was also a concern about mother's pattern of having close relationships with child sex offenders and exposing the child to those men. Despite the intervention, mother did not follow through with the recommended services and continued a relationship with a convicted child sex offender.

In mid-2008, mother's relationship with grandparents was becoming increasingly hostile. The guardianship ended, and mother and C.P. moved out of the grandparents' home. While on her own, mother neglected basic cleaning and sanitation. The cat and C.P. regularly wet the bed, and mother did not clean up or change the sheets. She neglected to wash dishes or dispose of garbage. In addition, mother continued to date men with a history of child sex abuse. She also displayed hostile and angry behavior towards grandparents which caused C.P. to react with aggressive outbursts. Mother could not set consistent rules, and the child lacked a sense of security and predictability. Due to these concerns, in August 2008, DCF filed a petition to have C.P. adjudicated a child in need of care or supervision (CHINS). Initially, mother had custody under a protective order. Following mother's violation of the order by permitting contact between the child and a convicted sex offender,[1] DCF took custody in February 2009. DCF placed C.P. with her grandparents, where she continues to reside.

---

[1] Following a contested hearing in the family division in February 2009, the court found that mother knowingly permitted contact between C.P. and a man who was convicted of sex offenses against children. While this finding was made by a preponderance-of-the-evidence

Following a contested hearing, C.P. was adjudicated CHINS. The CHINS court found that mother had placed C.P. in danger by permitting substantial contact between her and a known child sex offender. The court also found that mother had deliberately been untruthful with DCF and the court regarding this contact. The termination of parental rights (TPR) court reviewed the record from the CHINS hearing, and adopted those findings by clear-and-convincing evidence.

The initial case plan sought reunification with mother. DCF then shifted its goal to add a concurrent plan of placing C.P. with grandparents for eventual adoption. In March 2010, following a contested hearing, the court rejected a plan to place the child with the grandparents under a permanent guardianship.[2] In its findings, the court expressed concern about mother's history of dating men convicted of sexually abusing minor females. The court found that mother had lied about these relationships and C.P.'s contact with mother's boyfriends. The court also noted that C.P.'s mental health was negatively affected by the strained relationship between mother and grandparents. The court recounted the opinion of C.P.'s counselor that "it would be traumatic for [C.P.] if she could not live with her mother." Ultimately, the court rejected the permanent guardianship because it could not make the requisite findings by clear-and-convincing evidence that mother would not be able to resume parenting within a reasonable period of time or that it was unlikely C.P. would not be adopted. See 14 V.S.A. § 2664(a)(1)-(2). Therefore, the court approved a permanency plan with the goal of reunification, but admonished mother that such reunification would first require mother to substantially improve her compliance in a number of areas.

In May 2010, DCF filed to terminate mother's parental rights. The court held a hearing over five days between January and June 2011.

In August 2011, the court issued a written order. The court concluded that there was a change of circumstances due to mother's lack of improvement. Next, the court considered the statutory best-interests factors. Based on testimony from a child psychologist, who worked with C.P. in group and individual settings, the court found that C.P. has reactive attachment disorder (RAD). Some of C.P.'s symptoms of the disorder are the child's aggressive and defiant attitude with caregivers, her inappropriate sexualized behavior with other children, her lack of empathy, and her bedwetting and chronic constipation. Based on the evidence, the court also found that C.P. has post-traumatic stress disorder. C.P. exhibits sexualized behavior and has knowledge of sexual matters beyond her years. The court stressed that the child needs a consistent, competent caregiver and a trusting environment to overcome these issues. The court concluded that mother would not be able to resume parenting during a reasonable period of time given her continued inability to put her child's needs ahead of her own, and the child's immediate need for a stable environment. The court found that grandparents were providing C.P. with consistent care-giving and appropriately responding to C.P.'s emotional needs. Therefore, the court concluded that termination was in C.P.'s best interests.

On appeal, mother does not challenge the court's findings regarding stagnation. Mother argues the court's best-interests analysis was faulty because the court erred in finding that mother does not play a constructive role in C.P.'s life and that visits with mother were contrary to C.P.'s best interests. Mother claims that the evidence demonstrated that with proper supervision and

---

standard, by agreement of the parties, the TPR court reviewed the testimony and made the same finding by a clear-and-convincing-evidence standard.

[2] The TPR court also reviewed this evidence, and adopted these findings by a clear-and-convincing-evidence standard.

2

careful selection of activities, mother's visits with C.P. were positive. Mother also contends that the testimony of C.P.'s therapist referred to in the March 2010 order demonstrates that severance of contact with mother will be traumatic for the child.

In evaluating a child's best interests, the family court must consider four statutory factors. 33 V.S.A. § 5114. The most important factor is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. In re B.M., 165 Vt. 331, 336 (1996). "Individual findings of fact will stand unless clearly erroneous, and conclusions of law will be upheld if supported by the findings. When findings are attacked on appeal, our role is limited to determining whether they are supported by credible evidence." In re A.F., 160 Vt. 175, 178 (1993) (citation omitted).

Mother's challenge to the court's best-interests analysis focuses on two of the statutory factors. First, whether mother "has played and continues to play a constructive role, including personal contact and demonstrated emotional support and affection, in the child's welfare." 33 V.S.A. § 5114(a)(4). Second, she refers to the court's consideration of the "interaction and interrelationship of the child with his or her parents, . . . and any other person who may significantly affect the child's best interests." Id. § 5114(a)(1).

The court did not err in evaluating either of these factors. As to mother's interaction with C.P., the court acknowledged that mother and C.P. had recently shared some positive contact during visits watching movies. Nonetheless, the court found that this experience would not translate into mother being able to care full time for C.P. and that these moments could not override the other evidence regarding mother's negative impact on C.P. C.P.'s psychologist testified that she had tracked C.P.'s behavior and found that C.P.'s emotional outbursts spiked around times when she visited with her mother. Based on the psychologist's testimony, the court found that C.P. "exhibited an increase[d] level of anxiety and fear for her safety before, during, and after the times she visited with her mother." The court concluded that C.P.'s contact with mother "exacerbates the child's emotional disorder, triggers the child's hostile and aggressive behavior, and impairs the progress the treatment team is making with the child's long health." Thus, notwithstanding isolated moments of positive contact between mother and child, the findings support the court's conclusion that contact with mother is contrary to C.P.'s best interests, and the evidence supports the court's findings. See In re A.F., 160 Vt. at 178 (findings must be affirmed if supported by credible evidence).

Mother also contends that the termination court's finding that parent-child contact is contrary to C.P.'s best interests is contradicted by the March 2010 order, which refers to testimony from C.P.'s counselor that severing contact with mother may cause trauma to C.P. There is no conflict. In March 2010, C.P.'s counselor expressed that it would be traumatic for C.P. if she could not live with mother. Yet, mother made no progress towards being able to parent C.P. At termination, the court found that mother's post-March 2010 conduct had demonstrated that "mother will not take the steps necessary to gain the skills and insight to properly and adequately parent[] this child who is becoming increasingly difficult [to] parent because of the mother's repeated failures to address the child's clearly demonstrated need for stability, cleanliness, personal safety, and psychological development."

This is not a case where "a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate remedy." In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 583 (mem.) (noting that while in some cases a loving parental bond will override other factors, that was not situation here where evidence and findings plainly demonstrated that parental bond had harmed children). To the contrary, the evidence regarding

the best interests of C.P. was extensive, including the following. Mother refused to control her emotions in front of the child, causing C.P. to be distressed and engage in emotional outbursts. Mother had provided an unsanitary and chaotic environment for C.P., resulting in C.P. having RAD and PTSD. She exposed C.P. to known child sex offenders, and refused to discontinue this pattern. Mother's current companion has adjudications of sexually assaulting minors, yet mother deems he can co-parent C.P. and their new baby because she suggests that he targets only pubescent minors. Mother fails to understand the connection between her choice of companions and her child's safety. The child fears for herself when with mother. Mother is unable to properly care for C.P. and to provide consistent limits to address C.P.'s RAD and PTSD. The evidence supports the findings, which in turn support the court's conclusion that the child's best interests required termination of mother's residual parental rights, and thus, legal severance of the parent-child relationship.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
John A. Dooley, Associate Justice


_____
Beth Robinson, Associate Justice