*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2012-215

NOVEMBER TERM, 2012

In re K.B., Juvenile          }    APPEALED FROM:

                                 }

                                 }    Superior Court, Rutland Unit,

                                 }    Family Division

                                 }

                                 }    DOCKET NO. 119-8-08 Rdjv

                                     Trial Judge: Nancy Corsones

In the above-entitled cause, the Clerk will enter:

Mother appeals an order of the superior court, family division, terminating her parental rights with respect to her son, K.B. We affirm.

The undisputed findings reveal the following facts. K.B. was born in March 2003. From birth, he was plagued with significant and chronic medical conditions, including ongoing respiratory problems and acid reflux, which made it difficult for him to gain weight. At the age of two, he began to display significant aggression, mostly directed towards other children at his daycare. By the age of five, his behavior had become so aggressive and violent that he was admitted to the Brattleboro Retreat at his doctor's insistence. The retreat staff became concerned about the prospect of returning K.B. to his mother's home after observing the child's extremely disturbing and sexualized behaviors, and mother's seeming inability to comprehend the depth and severity of K.B.'s behavioral issues and the level of care necessary to address those behaviors. In August 2008, two months after K.B. entered the retreat, the Department For Children and Families (DCF) filed a petition alleging that he was a child in need of care or supervision (CHINS) in light of mother's cognitive limitations and K.B.'s extreme behaviors, which posed a potential danger to mother's younger two children.

K.B. was ordered into state custody on August 19, 2008 and placed in a residential treatment facility. When he arrived at the facility at age five and one half, he was still not toilet trained and could not hold a knife or fork, count to ten, say the alphabet, recognize letters, or hold a pencil. During his thirteen-month stay at the facility, he was given a psycho-educational evaluation, which resulted in diagnoses of Attention Deficit Hyperactivity Disorder, generalized Anxiety Disorder, and Adjustment Disorder with Mixed Emotions. He also scored very high on the Autism spectrum scale and had a limited intelligence quotient of 69.

The disposition plan called for continued DCF custody until K.B. could return to mother's home. The plan contemplated eventually moving K.B. from the residential facility to foster care before transitioning him to mother's home. Upon K.B's discharge from the residential facility in October 2009, mother was still unable to safely parent K.B., so he was moved into his current foster home, where he received an extensive network of support to deal with his ongoing physical and emotional problems. K.B.'s extreme behavioral problems

continued, and on a couple of occasions he was temporarily placed in a residential treatment program.

At the eighteen-month review in February 2010, the permanency plan goal changed to a concurrent plan of reunification with mother or adoption. A June 2010 forensic evaluation of K.B., his biological family, and his foster family revealed that mother had limited cognitive functioning and efficiency and that K.B. was in the top one percent of the population in terms of need for treatment, services, and supervision.

By the time of the three-year review, DCF had concluded that mother had not acquired the level of skill to keep K.B. or other children around him safe, given her inability to understand the seriousness of K.B.'s behavioral problems. On June 7, 2011, DCF filed petitions to terminate the parental rights of K.B's mother and father. A four-day termination hearing took place in February 2012, at which time father voluntarily relinquished his parental rights conditioned upon mother's rights being terminated. Following the hearing, the court concluded that there was a substantial change of circumstances due to stagnation in mother's ability to parent K.B. and that the termination of mother's parental rights was in K.B.'s best interests.

Mother appeals, arguing that, in terminating her parental rights, the family court mistakenly sacrificed the critical bond between her and K.B. for the uncertainty of his foster placement. See In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 583 (mem.) (noting that "in some cases a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate remedy"). According to mother, the court failed to appreciate the importance of maintaining her bond with K.B. and further failed to make a critical finding on a question central to determining the significance of that bond—specifically, whether K.B. acted out before and after visits with mother because of separation anxiety associated with the absence of his primary attachment figure, as mother's expert suggested, or because he was simply reverting back to the behavior that had led to his removal from mother's custody in the first place.

In effect, mother asks us to reweigh the evidence on the bond between her and K.B., which we will not do. The trial court stated that it was impossible to know for sure why K.B. acted out before and after visits with mother. The experts provided differing views on the basis for K.B.'s behavior. The court was not compelled to choose a position and attempt to determine what triggered K.B.'s actions. The court's finding accurately reflected the evidence indicating that it was impossible to know for sure what prompted K.B.'s behavior before and after mother's visits. The court frankly acknowledged that the foster mother had sought "to cut mother out of K.B.'s life" and that it was not entirely convinced DCF had done the right thing in reducing visits with mother. The court also had concerns over a troubling relationship between K.B. and his foster brother. While acknowledging mother's genuine efforts to demonstrate love and affection for K.B., the court found those efforts were "far outweighed" by mother's failure over more than a three-year period to improve her parenting skills "even to the slightest degree." It found "there is no reasonable probability that [mother] will be able to resume parental duties within a reasonable period of time, as measured from the perspective of nine year old K.B." In contrast, the court concluded that K.B.'s foster parents had the willingness and ability to address K.B.'s extraordinary needs for the duration of his childhood. We will not disturb the judgment of the family court, which applied the correct legal standards and made findings and conclusions supported by the evidence. See In re M.B., 162 Vt. 229, 238 (1994) (recognizing that public policy does not dictate maintaining parent-child bond regardless of cost to child).

2

Mother argues that, notwithstanding the foster parents' professed desire to adopt K.B., K.B.'s continued troubled history while in their care raises doubts about whether the placement will work in the long run. This argument is unavailing insofar as the family court may terminate parental rights even in cases where no alternative placement has been identified at the time of the termination hearing, as long as the best-interest criteria support the termination decision. See In re E.B., 158 Vt. 8, 15 (1992) (noting that termination of parental rights does not depend on existence of alternative placement).

Affirmed.

BY THE COURT:


_____
John A. Dooley, Associate Justice


_____
Marilyn S. Skoglund, Associate Justice


_____
Brian L. Burgess, Associate Justice

3