*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2012-477

APRIL TERM, 2013

| | |
|---|---|
| In re J.S., Juvenile | APPEALED FROM: |
| | |
| | Superior Court, Caledonia Unit, Family Division |
| | |
| | DOCKET NO. 33-2-12 Cajv |
| | |
| | Trial Judge: M. Kathleen Manley |

In the above-entitled cause, the Clerk will enter:

Mother appeals from the termination of her parental rights in son J.S. She argues that the court abused its discretion because its order does not serve J.S.'s dual needs of permanency and mother-child contact. We affirm the termination order.

J.S. was born in Texas in December 2002. The family moved to Vermont after Texas child welfare authorities became concerned that J.S. was being physically abused. In Vermont, when J.S. was three months old, he was placed with his maternal aunt, who later became his guardian. J.S. was taken into the custody of the Department for Children and Families in February 2012 after disclosing that his aunt bit him, leaving a mark on his arm. He was declared to be a child in need of care or services, and the aunt's guardianship was terminated. DCF later moved to terminate mother's parental rights and following a hearing, the court granted its request.

The court found as follows. J.S. suffered horrific abuse at the hands of his aunt and is extremely traumatized as a result. He suffers from post-traumatic stress disorder and possibly attachment disorder. He has made progress in his foster home, improving from the feral-like state he was in when first taken into custody. His foster mother has worked very closely with J.S.'s counselor to provide J.S. with a safe place and to learn how to address his extreme behaviors. The counselor indicated that J.S. needed to make a strong, healthy attachment to his caregiver, and that he needed to learn to regulate his emotions and be supported in doing that. He needed calm, consistent, skilled, therapeutic parenting with much stability. The counselor emphasized that J.S.'s caretaker needed to be able and willing to work with a trained counselor in gaining the skills necessary to provide the type of care that J.S. needed for his wellbeing. While the counselor believed that J.S. had made amazing progress, she feared that he might not recover from a second interruption in his placement.

As to mother, the court found that her rights in two other children had been terminated; one of these children suffered severe physical abuse at age four months. Mother's father is a convicted child sex offender, and mother lived much of her life with her parents. Mother does

not believe that her father did anything wrong. Mother has significant developmental disabilities. She is vulnerable to being manipulated, and she has difficulty in finding solutions to problems because she is unable to identify what causes those problems. This was a significant impediment in her ability to care for J.S. Mother visited J.S. in 2012 but this encounter was awkward as there was no direct contact between J.S. and mother. J.S. conveyed messages to mother through others, and mother did the same. J.S.'s counselor emphasized that if there was going to be contact between J.S. and mother, it would have to be done in a very safe way.

The court found that while mother loved J.S. and had made efforts throughout the years to have contact with him, she had no relationship with him. Mother also had not engaged in any significant parent education, which was absolutely crucial to her ability to parent a child, let alone a child with J.S.'s needs. Additionally, the court considered DCF's prior attempts to assist mother in being able to parent her children, and observed that many of the issues that existed in 2008, when mother's rights in two other children were terminated, continued to exist. For these and other reasons, the court concluded that mother would not be able to successfully parent J.S. within a reasonable period of time. The court also found that another change or placement for J.S. could set him back substantially. It explained that J.S. had already experienced rejection and abandonment, and another change to a single-parent household with an inexperienced parent would be problematic. Indeed, given J.S.'s behaviors and needs, he would be a challenge for even the most experienced and successful parent. J.S. needed stability, safety, and permanence. Based on its findings, the court concluded that termination of mother's rights was in J.S.'s best interests.

In reaching its conclusion, the court noted that one doctor opined that there should be contact between mother and J.S. as J.S. was curious about why he had been left with his aunt. The court explained that once mother's rights were terminated, she would have no right of contact. Indeed, it noted that J.S. had suffered a setback following his visit with mother and that, while he might be curious, he was emotionally fragile. The court reiterated that it had no legal authority to issue any type of parent-child contact order and that it was best left to J.S.'s counselor, in consultation with his foster parents, to determine if and when such contact should occur. Mother appealed from the court's order.

On appeal, mother asserts that the court should not have terminated her rights because it would be beneficial to J.S. to have ongoing parent-child contact and it would serve his best interests. It is evident that the court concluded otherwise. It applied the statutory best-interest factors and concluded that termination of mother's rights were in J.S.'s best interests. The court's findings are unchallenged, and the findings support the court's conclusion. See In re G.S., 153 Vt. 651, 652 (1990) (mem.) (explaining that as long as the trial court applied proper standard in determining child's best interests, Supreme Court will not disturb its findings on appeal unless they are clearly erroneous and will affirm its conclusions if they are supported by findings). While J.S. might be curious about mother, the court determined that this did not trump his need for stability, permanence and a highly skilled caregiver.

Mother suggests that the court or DCF should have devised a method by which parent-child contact could continue while at the same time affording J.S. permanency. She does not explain what this order would look like. To the extent that she is referring to long-term foster care, it appears obvious that this approach, which could extend lack of permanency for J.S.

2

indefinitely, would not serve his best interests based on the findings above.  See, e.g., <u>In re J.F.</u>, 2006 VT 45, ¶ 21, 180 Vt. 583 (mem.) (given that child's safety and permanence are of paramount concern, long-term foster care is least desirable permanency option).  More significantly, given the court's decision to terminate mother's parental rights based on its evaluation of the statutory factors, the court was not required to consider alternative dispositions for J.S.  See <u>In re T.T.</u>, 2005 VT 30, ¶ 7, 178 Vt. 496 (mem.) (holding that once trial court determines that termination is proper disposition under statutory best-interests criteria, it need not explain why it is choosing termination over other statutory permanency options).

<u>Affirmed</u>.

BY THE COURT:

_____
John A. Dooley, Associate Justice


_____
Brian L. Burgess, Associate Justice


_____
Beth Robinson, Associate Justice