*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

### ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-314

FEBRUARY TERM, 2015

| | |
|---|---|
| In re T.M., Juvenile | } APPEALED FROM: |
| | } |
| | } Superior Court, Lamoille Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 6-1-12 Lejv |

Trial Judge: Timothy B. Tomasi

In the above-entitled cause, the Clerk will enter:

Mother appeals an order by the superior court, family division, terminating her parental rights with respect to her daughter, T.M. We affirm.

T.M. was born in January 2001. The Department for Children and Families (DCF) became involved with the family in January 2005 after receiving a report that T.M.'s brother had been sexually abused by an older boy. At some later point, DCF substantiated a report that the brother had sexually abused T.M. In 2011, T.M. made multiple reports to school staff that mother was injecting drugs. In January 2012, DCF presented mother with an ultimatum that she either enter residential substance abuse treatment and arrange for T.M.'s care or DCF would file a petition alleging that T.M. was a child in need of care or supervision (CHINS). That same month, mother entered residential substance abuse treatment. Within two weeks of her doing so, T.M.'s father took T.M. to the hospital after she accidently ingested sleeping pills that had been dissolved in soda, but then abandoned her there. DCF filed a CHINS petition that day, and T.M. was placed with her maternal grandmother. On April 10, 2012, T.M. was adjudicated as CHINS based on the parties' stipulation.

Meanwhile, mother was asked to leave the residential program following an altercation that she had with another resident. She then entered an intensive outpatient program but was terminated from that program after testing positive for marijuana. T.M. and her brother moved in with mother in May 2012. The following month, mother was involved in a single-car accident. She tested positive for amphetamines and ecstasy and was cited for driving under the influence. Mother refused medical treatment and returned home. T.M. later reported to school officials that she was scared about taking care of mother because mother was hallucinating. DCF filed a second CHINS petition in June 2012, and shortly thereafter, custody of T.M. was returned to DCF. An amended October 2012 disposition case plan set concurrent goals of reunification or adoption and called for mother to engage in substance abuse and mental health services, to participate in family time coaching, to provide adequate supervision of T.M., to attend to T.M.'s medical needs, and to participate in DCF treatment team meetings.

Following the accident, mother entered a second intensive outpatient treatment program, but she relapsed, admitting to DCF that she was using cocaine intravenously. Sometime after

dropping out of the drug treatment program in December 2012, mother began individual therapy. She maintained only sporadic attendance until April 2013, when she attempted suicide by overdosing on her medications. Mother's therapist felt that mother needed a higher level of care than she could provide, but mother refused to enter the recommended treatment centers because those programs would not allow her to smoke. T.M. remained with the same foster family from January 2013 until March 2014, but left because of rising tensions between her and the foster mother. The current plan is to place T.M. with her paternal aunt and her husband, who plan to adopt her.

In July 2013, DCF filed a petition to terminate mother's and the father's parental rights. The father voluntarily relinquished his parental rights in January 2014. A termination hearing concerning mother's parental rights was held over three days between April and June 2014. The family court terminated mother's parental rights in a decision filed on August 8, 2014.

On appeal, mother argues that the family court erred by: (1) factoring in her inability to resume parental duties when considering the first and fourth statutory best-interest criteria, which focus in part on the quality of the parent-child bond; and (2) focusing on mother's deficiencies as a parent rather than on T.M.'s need for contact with mother. Mother points to testimony indicating that mother and T.M. love each other, and that T.M. would benefit from continued contact with mother as she gets older. She contends that, in addressing the statutory criteria concerning the parent-child bond, the court mistakenly focused on mother's inability to resume her custodial duties rather than on whether continued contact between mother and T.M. would be in T.M.'s best interests. Citing our case law stating that "in some cases a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate remedy," In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 583 (mem.), mother argues that the court effectively used one of the best-interest criteria—whether mother would be able to resume her parental duties within a reasonable period of time—to negate the criteria concerning the parent-child bond. According to mother, those latter criteria focus on whether a parent who is unable to be a custodial parent may serve a noncustodial role that is in the best interests of the child. In the same vein, mother argues that the court erroneously focused on her deficiencies rather than on whether noncustodial contact with her would be in T.M.'s best interests.

We disagree with mother's assessment of the family court's decision and the relevant law. In weighing a child's best interests in a termination proceeding, the court must consider: (1) the child's "interaction and interrelationship . . . with his or her parents" and others; (2) the child's adjustment to "her home, school and community"; (3) the likelihood of the parent being able to resume parental duties within a reasonable period of time; and (4) "[w]hether the parent has played and continues to play a constructive role, including personal contact and demonstrated emotional support and affection, in the child's welfare." 33 V.S.A. § 5114(a). Here, regarding mother's interaction with T.M. and the role she played in the child's life, the court first acknowledged that T.M. and mother love each other and have a strong bond. The court further stated that the bond between mother and T.M. had more force than it would in a situation with a younger child. Nevertheless, the court concluded that mother had not played a constructive role in T.M.'s life because of: (1) mother's continued addiction to drugs, which was one of the causes of T.M.'s post-traumatic stress disorder; (2) her inability to provide a safe and secure environment that professionals believe is critical for T.M.'s safety and success; (3) her failure to maintain consistent visits with T.M., which has caused T.M. to suffer anxiety concerning mother's safety; and (4) her continually engaging in adult subjects with T.M. despite being told not to do so and knowing that some of the discussions upset T.M.

This court's conclusion that mother does not play a constructive role in T.M.'s welfare is supported by the court's unchallenged findings. The court found that mother's claim of being drug-free is not credible. The court also made several findings about inappropriate and potentially damaging interactions between mother and T.M. There was evidence that T.M. engaged in hyper-sexualized behavior, was especially vulnerable to sexualized situations in dealing with boys, had difficulty setting appropriate boundaries on social media interactions, and remained at high risk of engaging in dangerous activities because of her disorders resulting from sexual abuse by her brother and trauma from being exposed to her parents' substance abuse. Yet, as the court found, mother considered T.M.'s potentially dangerous activities to be "normal teenage indiscretions" and did not want to "sour her relationship" with T.M. by being too strict with her. The court gave one example where mother was not intervening when T.M. was taking a video of two small children and encouraging the little girl to tell the little boy that he was hot and that she wanted to have sex with him. The court found that mother had little insight into T.M.'s special conditions and the need for special vigilance. The court also found that mother had failed to take advantage of the opportunities for interaction with T.M. over the years, that her visitation had been limited because of her refusal to adhere to DCF requirements concerning T.M.'s safety, and that her contact with T.M. had been "extremely sparse" during the last eighteen months.

These findings and conclusions demonstrate that the court carefully considered in its termination decision the role that mother had played and continued to play in T.M.'s life. Essentially, the court determined, in relevant part, that termination of mother's parental rights was in T.M.'s best interest because mother's interactions with T.M. were sparse and potentially harmful to T.M.'s welfare. The court's conclusion that mother did not play a constructive role in T.M.'s welfare was not equivalent to, or made superfluous by, its conclusion that mother would not be able to resume her parental duties within a reasonable period of time. The court properly reviewed the statutory factors and made a decision that is supported by the record. "[O]nce, the family court applies the [statutory] criteria . . . and determines that the child's best interests warrant giving the State custody of the child without limitation as to adoption, the court need not revisit [other statutory] permanency hearing options . . . and explain why it is choosing termination of parental rights over [those] other options . . . ." In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496 (mem.).

    Affirmed.

BY THE COURT:

 

_____

Paul L. Reiber, Chief Justice

 

_____

John A. Dooley, Associate Justice

 

_____

Harold E. Eaton, Jr., Associate Justice

3