VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.          22-AP-292

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JUNE TERM,   2023

In re C.C., Juvenile (N.B., Mother\*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Orleans Unit,
Family Division
CASE NO. 67-11-15 Osjv
Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights to son C.C., who is thirteen years old.  We affirm.

C.C. was born in 2009.  Beginning that year, the Department for Children and Families (DCF) regularly received reports suggesting abuse or neglect of C.C.  In November 2015, when C.C. was six, mother punched him in the nose.  The State filed a petition alleging that C.C. was a child in need of care or supervision (CHINS) due to abuse and neglect.  The court issued emergency and temporary care orders transferring custody of C.C. to DCF.  Mother stipulated that C.C. was CHINS due to lack of proper parental care in February 2016.  At disposition, the court continued DCF custody and adopted a case plan with concurrent goals of reunification or adoption by June 2017.

In July 2019, DCF petitioned to terminate mother's parental rights.[*]  The court held several status conferences in 2019 and 2020 at which the parties indicated reluctance to move forward with a final hearing due to uncertainty surrounding placement for C.C.  In September 2021, DCF indicated that it wished to proceed with the petition even if no pre-adoptive home was confirmed, because C.C. needed permanency.

The court held the termination hearing over two days in January and March 2022.  In a written order issued in October 2022, the court made the following findings.

After the CHINS petition was filed, mother was charged with cruelty to a child and was incarcerated for a period.  She pled guilty and was placed on probation.  Her conditions initially prohibited her from contacting C.C., and she did not see him for about a year.

---

[*] DCF also filed a petition to terminate father's parental rights.  That petition has not yet been resolved.

When C.C. entered DCF custody, he exhibited highly dysregulated behaviors. He became escalated and aggressive for no apparent reason. He would yell, hit, kick, and swear. His behaviors were so extreme that DCF decided it was not possible to place him with family members or trained foster parents. Instead, he was placed in a series of residential placements including Pine Haven Boys Center, Brookhaven, the Brattleboro Retreat, and Littleton Academy.

During his first placement, C.C. was evaluated by a psychologist, who diagnosed him as having post-traumatic stress disorder, attention deficit hyperactivity disorder, and intermittent explosive disorder. The psychologist recommended that C.C. be placed in a small residential placement, that parental contact be carefully supervised, and that C.C.'s paternal grandmother continue to be involved in his life. C.C. was subsequently evaluated by a neuropsychologist, who determined that C.C. had been exposed to complex trauma, including physical abuse and neglect. He had a developmental delay and a speech-and-language disability. His presentation and history were consistent with fetal alcohol syndrome.

The case plan adopted at disposition contained recommendations for mother to engage in mental-health and substance-abuse treatment, obtain safe and stable housing, develop an understanding of how her substance abuse affected C.C., and engage in parent education. In the six years since disposition, mother had intermittently engaged in individual counseling but never completed a mental-health assessment. She failed to maintain contact with DCF. She had not attained stable housing. She had not been employed since 2008, when she was pregnant with C.C. She relied on government assistance and family to survive. Mother never provided a substance-abuse assessment to DCF. At the hearing, she testified without rebuttal that she had been sober for three-and-a-half years. The court found no evidence that mother had developed insight into the impact of her past substance abuse on C.C. or had a relapse prevention plan, as the disposition case plan required. Mother also did not participate in any parenting education programs.

After the no-contact probation condition was lifted in November 2016, mother began writing letters to C.C., then making telephone calls, then having supervised visits. Mother eventually progressed to having unsupervised visits with C.C. in May 2017. Mother does not drive, so DCF provided transportation to C.C.'s placements. The visits went well, but C.C. continued to be aggressive to other students and staff outside of these visits. In January 2019, C.C. was transferred to the Brookhaven School. Mother visited him there and participated in family therapy for a time. However, C.C. continued to have explosive outbursts and in December 2019, assaulted four teachers and students. He was placed in an emergency bed at the Brattleboro Retreat.

In February 2020, C.C. was transferred to Littleton Academy, a school in Massachusetts for children aged six to twelve who have special behavioral needs. There, he formed trusting relationships with staff. He made substantial progress in using language to express his needs, and his episodes of dysregulated behavior became much less frequent.

After the pandemic began, in-person visits were suspended for several months. Mother failed to maintain consistent telephone or virtual contact with C.C. During one telephone call, mother told C.C. that it was not her fault that he was in DCF custody. This upset C.C., and he regressed in his behaviors. C.C. eventually requested that virtual contact with mother stop. At the time of the January 2022 termination hearing, mother had not spoken to C.C. in eight months and had not seen him in person in two years. In the meantime, C.C. had multiple calls a day with his grandmother, who is the person C.C. seeks out for comfort and reassurance.

The court found that after C.C. graduated from Littleton Academy, he would need a care provider who understood his trauma history and how to meet his needs, as well as a team of community providers. DCF was not sure where C.C. would be placed after his graduation. During a team meeting, mother expressed to DCF staff that she did not feel ready to care for C.C. and supported placing him with any family member that passed a background check. She was confident that she could make substantial progress toward housing, employment, and addressing her mental health needs such that she could resume parenting him within three months.

The court found there had been a change in circumstances since initial disposition due to mother's stagnation. It assessed the statutory best-interests factors and determined that C.C. needed the certainty of an adoption case plan and that mother was unlikely to be able to resume parental duties within a reasonable time. It therefore granted the termination petition.

On appeal, mother argues that the court erred in finding that her progress had stagnated and that she would not be able to resume parental duties within a reasonable time. She points to evidence that she had many positive visits with C.C. and he sometimes expressed a desire to see her, that she had been sober for over three years, and that DCF had not identified a permanent placement for C.C.

When the State seeks to terminate parental rights after initial disposition, the court must first determine whether there has been a change in circumstances justifying modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). If this threshold condition is met, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). Id. The requisite change in circumstances "is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." Id. (quotation omitted). "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention." In re T.M., 2016 VT 23, ¶ 12, 201 Vt. 358 (quotation omitted). "We will affirm the court's decision if the findings are based on the evidence and support the court's conclusions." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.).

The court's determination that mother had stagnated in her progress toward reunification is amply supported by its findings and the record. In the six years since disposition, mother had not achieved stable housing, engaged in sustained mental-health treatment, demonstrated progress in managing her depression and anxiety, or engaged in any parent-education programs. Although she self-reported that she was sober, there was no evidence that she was working with providers or had a relapse-prevention plan to support her recovery. She also had failed to stay in contact with DCF. This evidence supports the court's determination that mother had failed to make substantial progress toward addressing the factors that led to state intervention. See In re D.M., 162 Vt. 33, 38 (1994) (stating stagnation may be found where parental "improvement is so insignificant that it is unlikely the parent will be able to resume parental duties in a reasonable time").

Likewise, the record supports the court's determination that mother was unlikely to be able to resume parenting C.C. within a reasonable time, which is the "most important factor" in the best-interests analysis. In re J.B., 167 Vt. 637, 639 (1998) (mem.). "The reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 (citations omitted). Mother was afforded an exceptionally long amount of time to address her own

3

substance abuse and mental-health needs, engage in parental education, and obtain a stable living situation, yet made little progress.  She had not spoken to C.C. for eight months and had not seen him in person in over two years.  The court was therefore understandably skeptical that mother could make sufficient progress to achieve reunification within the next few months.  Further, C.C. had special behavioral needs and required a caregiver who understood how best to address those needs.  The court found that C.C. needed permanency after spending half his life in DCF custody and would benefit from the certainty of an adoption case plan.  These findings are supported by the record and support the court's decision.  While mother contends that she loves C.C. and that he wants her to be in his life, this is not a case where the strength of the parental bond should "override other factors" in deciding whether termination is in the child's best interests.  In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 583 (mem.).

Mother argues that termination was not in C.C.'s best interests because adoption was not imminent and he would likely be in a residential placement for some time.  "Our law is clear, however, that a valid termination of parental rights does not depend on the availability of permanent foster care or adoption."  In re D.M., 162 Vt. at 40.  The fact that C.C.'s placement was uncertain does not require reversal where the evidence otherwise supports the court's conclusion that termination was in C.C.'s best interests.

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice

_____
William D. Cohen, Associate Justice

_____
Nancy J. Waples, Associate Justice

4