VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      25-AP-389



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

APRIL TERM,   2026

In re M.J., Juvenile
(M.J., Mother\*)

}
}
}
}
}
}
}

APPEALED FROM:

Superior Court, Franklin Unit,
Family Division
CASE NO. 24-JV-00746
Trial Judge: Howard A. Kalfus

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights to five-year-old M.J.  We affirm.

M.J. was born in June 2020 and has two older half-siblings.  In May 2024, the court granted an emergency care order transferring custody of M.J. to the Department for Children and Families (DCF) based on allegations that mother and M.J.'s father were using illicit substances in the home, the children had difficulty waking their parents, the children had serious unaddressed medical needs and lacked adequate food, and the family's apartment had no electricity.  The State subsequently filed a petition alleging that M.J. was a child in need of care or supervision (CHINS), and the court continued DCF custody at the June 2024 temporary care hearing.

M.J.'s half-siblings were the subject of a prior CHINS proceeding and were in DCF custody for much of the time between February 2019 and December 2022.  After M.J. was born, all three children were briefly placed with their maternal grandparents under a conditional custody order.  The order was rescinded in November 2020 after grandparents were unable to follow the conditions and permitted mother to have unsupervised contact with the children.  The children remained in foster care until trial reunification with mother began in February 2022. Mother regained full custody in November 2022.

The June 2024 temporary care order provided that mother would have a minimum of three supervised visits a week.  In August 2024, the State moved to amend the order to provide that parent-child contact would be scheduled as determined by DCF, because mother had only attended four out of twenty-seven scheduled visits.  Following a hearing, the court found that mother had been chronically absent from visits and granted the State's request to amend the

parent-child contact provision. In October 2024, the court found that the merits of the CHINS petition were established based on mother's stipulation.

DCF filed a case plan in November 2024 with a goal of reunification with either mother or father. The case plan contained action steps requiring mother to, among other things, engage in mental-health and substance-abuse treatment, maintain safe and stable housing, complete urinalysis as requested by DCF, and attend all team meetings regarding M.J.

A disposition hearing was scheduled for December 2024. At the hearing, the children's attorney stated that she was planning to move for termination of mother's rights and therefore objected to the case plan goals. The court did not issue a disposition order. The children's attorney subsequently filed petitions to terminate mother's and father's parental rights to M.J.

The court scheduled a termination hearing in May 2025. Mother and M.J.'s father did not attend. Mother's attorney did not object to proceeding with the hearing, conceding that she was properly served with notice of the hearing. The court commenced the hearing as to M.J.'s two half-siblings (both of whom were mother's children), but indicated it would continue the hearing as to M.J. until M.J.'s father was properly served with the petition and notice of hearing. The State presented evidence from M.J.'s foster mother and two DCF case workers, and mother's attorney participated on behalf of mother.

The State was unable to effectuate personal service upon M.J.'s father and, in August 2025, moved for the court to allow service by publication. The court granted the motion and ordered that the termination hearing would continue in October 2025.

At the October hearing, the State presented testimony from M.J.'s foster father and a DCF case worker. The court then issued oral findings and conclusions. The court found that at the beginning of the case, mother was fairly cooperative with DCF and was working with BAART to address her substance-abuse issues. However, mother made no other progress in addressing the concerns that led M.J. to enter state custody. Mother had not had any contact with M.J. for at least six months. Prior to then, mother contacted M.J. by FaceTime, but she frequently missed calls or called late in the evening. When mother's calls began to interfere with M.J.'s bedtime, the foster parents asked her to call on time. Shortly afterward, mother stopped calling altogether.

The court analyzed the best-interests factors and found by clear and convincing evidence that all four factors weighed in favor of termination of mother's parental rights. It found that M.J. had a loving relationship with his foster family and his half-siblings and was well-adjusted to his foster home and school. He had not seen or spoken with mother in at least six months. Mother's lack of progress with respect to the issues that led M.J. to enter custody and her decision to voluntarily absent herself from M.J.'s life meant that she would not be able to resume a parental role within a reasonable time as measured from M.J.'s perspective. Finally, although mother loved M.J., she had not demonstrated emotional support or affection for him in recent months. The court therefore granted the petition to terminate mother's rights.[*]

"The family court may terminate parental rights at the initial disposition proceeding if the court finds by clear and convincing evidence that termination is in the child's best interests." In

---

[*] At the October 2025 hearing, the court also terminated M.J.'s father's parental rights, but he did not appeal. Mother's rights to M.J.'s half-siblings were terminated in separate proceedings, and she did not appeal those decisions.

re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29; see 33 V.S.A. §§ 5318(a)(5) (authorizing termination at initial disposition), 5114(a) (listing best-interests factors). We have stated that such cases should be rare but will uphold the family court's decision if the evidence supports the decision. In re B.M., 165 Vt. 194, 199-200 (1996). "The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "The reasonableness of the time period is measured from the perspective of the child's needs and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30 (citations omitted). This factor reflects "a general policy that total termination of parental rights will not be ordered in the first instance if there is a reasonable possibility that the causes and conditions which led to the filing of the petition can be remedied and the family restored within a reasonable time." In re B.M., 165 Vt. at 199 (1996). We will affirm the court's findings unless they are clearly erroneous and will uphold its legal conclusions if supported by the findings. In re J.B., 167 Vt. at 639.

Mother argues that the court erred in granting termination at initial disposition because there was evidence presented in the May 30, 2025 hearing that M.J. still had a bond with mother, enjoyed her company, and mentioned her to their foster family. We have acknowledged that "in some cases a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate remedy." In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 586 (mem.). However, this is not such a case. The record shows that by the time of the final day of hearing, mother had not seen M.J. in person in nearly a year and had not spoken to him by phone for six to seven months. The foster mother testified at the May 2025 hearing that "the boys" mentioned mother about once a week, but the only specific example she gave concerned M.J.'s half-sibling, who was several years older than M.J. The State presented evidence that mother had not attended parenting meetings with DCF; made no progress on addressing her mental-health issues; did not seriously engage in substance-abuse treatment; did not comply with requests for urinalysis; did not obtain stable housing or income; did not provide releases for DCF to contact her medication-assisted treatment provider; and had not made a relapse prevention plan. Mother did not have a phone and appeared to be living with her parents, whom DCF did not view as safe caregivers for the children because they left the children unattended with mother. She had accrued several criminal charges during the case, appeared to have recently been involved in the theft of a purse from a convenience store, and there was an active warrant for her arrest.

The evidence supports the court's findings that mother had not made progress in addressing the issues that led to M.J. entering state custody and had not seen M.J. for over six months. These findings, in turn, supported the court's assessment that mother would not be able to resume parenting M.J. within a reasonable time. While mother essentially argues that the court should have greater weight to her parental bond with M.J., her disagreement with the court's assessment of this factor does not amount to an abuse of discretion. See In re A.F., 160 Vt. 175, 178 (1993) ("We leave it to the sound discretion of the family court . . . to weigh the evidence."); see also In re M.B., 162 Vt. 229, 238 (1994) (explaining that "[public policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child" and CHINS statute "recognizes that severance of that bond may be in the child's best interest").

Mother argues that the court should have considered alternative dispositions instead of termination to preserve the possibility that she might someday be able to reunify with M.J. "We have repeatedly rejected the claim, however, that the court must consider less drastic alternatives to termination once it has determined the parent to be unfit and unable to resume his or her parental responsibilities." In re G.F., 2007 VT 11, ¶ 20, 181 Vt. 593 (mem.). Having concluded

3

that termination of parental rights was in M.J.'s best interests in accordance with the statutory factors, the court was not required to fashion an alternative disposition.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Michael P. Drescher, Associate Justice