*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2013-136

JULY TERM, 2013

| | |
|---|---|
| In re B.S., R.M. and D.W., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Windsor Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 4/5/6-1-10 Wrjv |
| | |
| | Trial Judge: Katherine A. Hayes |

In the above-entitled cause, the Clerk will enter:

Mother appeals from the termination of her parental rights in B.S., R.M., and D.W. She argues that the court erred in assessing her relationship with the children. Mother also asserts that the court's decision as to D.W. lacks a rational basis. We affirm.

Mother gave birth to three children: D.W., born in January 1996; B.S., born in November 1999; and R.M., born in November 2004. In January 2010, the children were taken into the custody of the Department for Children and Families (DCF) after they reported being physically abused by Robert M., who was mother's boyfriend and R.M.'s father. At the time, the family was also struggling with homelessness and the children were not regularly attending school. The children were subsequently adjudicated as children in need of care and supervision. In May 2011, DCF moved to terminate mother's parental rights.[*] Following a four-day hearing, the court granted its request.

The court made the following findings. Mother suffered long-term sexual abuse by her stepfather, and she had never addressed this trauma through long-term or intensive therapy. As of January 2010, mother was married to Ed S., B.S.'s father, but having an affair with Robert M. D.W. and B.S. were very frightened of Robert M. and saw him as dangerous and violent. Mother frequently provided contradictory information to the DCF caseworker about Robert M. and Ed S. Mother would state that Robert M. abused her and the children, and then recant these claims. Mother also indicated that Ed S. had sexually abused her and D.W. The court noted that, in 2009, mother had provided sworn testimony in support of a relief-from-abuse order that Robert M. physically and verbally abused the children. Mother later recanted this statement, asserting that she was forced to file it by Ed S., or DCF, or both.

Mother engaged in inappropriate behavior during supervised visitation with the children. As one example, she stated in front of the children that Robert M. had raped D.W. As another example of mother's inappropriate behavior, the court recounted that mother allowed Robert M.

---

[*] The children's fathers voluntarily relinquished their parental rights.

to paint greetings for the children on the walls of her new apartment. Mother later crossed out the greetings with a marker but they were still visible.

Mother continued her relationship with Robert M., off and on, after the children were taken into custody. In November 2010, she reported that Robert M. had kidnapped and raped her. Robert M. was charged with multiple criminal offenses. Mother later recanted her accusations. An expert testified at the hearing that mother's behavior reproduced her earlier pattern of exposing herself to dangerous men and then becoming very confused about what had happened.

Beginning in August 2011, D.W. began reporting in some detail that she had been repeatedly sexually assaulted by both Ed S. and Robert M. beginning when she was five years old. D.W. said that she told mother about the abuse but mother simply denied or ignored her complaints. Mother asserted that the reports concerning Ed S. were true, but those involving Robert M. were not. At other times, mother said that she did believe Robert M. sexually assaulted D.W. D.W. largely refused visitation with mother as of September 2011 because mother took the position that D.W. was not sexually abused by Robert M.

Mother married Robert M. in September 2012. Both B.S. and D.W. were very upset by this news. B.S., like D.W., refused to visit mother. His therapist believed that forcing him to do so would likely cause him significant distress and cause him to regress. The doctor who conducted a forensic evaluation of the family testified at the hearing that mother's decision to marry Robert M., in light of their history and her prior complaints about him, was a stark example of her "living in more than one world." He thought it likely that in the future, mother would again conclude that Robert M. was a "bad man" and that there would be a resumption of the significant conflict between them.

This expert also found it unlikely that mother could successfully be reunited with the children because she could not consistently distinguish safe from unsafe situations across time, relationship, or context. He opined that mother likely needed at least a year of intensive skill-based and supported psychotherapy with a focus on psychological trauma, and even that treatment was unlikely to help. The expert testified that mother had little or no insight into the events that happened within her family and she had essentially no problem-solving capacity. Mother's mental health, moreover, was significantly impaired due to denial, fragmented personality, social isolation, and extremely impaired judgment and reasoning capacity.

DCF repeatedly referred mother to counseling—a critical element of the case plan—but mother never established a consistent relationship with a therapist. Additionally, the court found that although mother had taken some parenting and other courses, her decision-making ability had not improved, nor had the accuracy of her perceptions of reality, or her insight into her own issues in intimate relationships.

The court found that the children were doing well in their foster placements. It observed that, over time, both B.S. and R.M. had become less physically affectionate and less emotionally engaged with mother. As noted above, D.W. refused to visit mother.

2

Based on these and numerous other findings, the court concluded that mother had stagnated in her ability to parent and that termination of her rights was in the children's best interests. The court explained that mother could not exercise the judgment necessary to be an effective and healthy parent for her children due to her severe untreated mental health needs, and there was no prospect that this would change at any time in the future. The court noted that the children had all made enormous progress since coming into custody. While they still loved mother, and mother apparently loved them, the children's relationships with their foster parents were healthier and stronger than their connection with mother. For these and other reasons, the court ordered the termination of mother's rights. This appeal followed.

Mother first argues that the court did not correctly assess the mother-child bond. According to mother, the court came to no clear conclusion regarding the value of her bond with each child. Mother maintains that the court needed to consider the future values of the mother-child relationships because termination of her rights eliminates her right to visitation.

In evaluating whether termination of a parent's rights is in a child's best interests, the court must consider four statutory factors. See 33 V.S.A. § 5114. The most important factor is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. In re B.M., 165 Vt. 331, 336 (1996). The court must also consider, in relevant part, a child's interaction and interrelationship with his or her parents and foster parents, and whether the parent has played and continues to play a constructive role in the child's welfare. 33 V.S.A. § 5114(a)(1), (4). The court is not required to predict how the parent-child bond might change in the future. As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

The court applied the proper standard here and its decision is supported by the record. The trial court recognized that the children loved mother and that mother loved them to the best of her ability. Nonetheless, mother placed her children at significant risk while they were in her care, and exposed them to men whom her children repeatedly accused of physical and/or sexual abuse. The court concluded that mother's continued intractable resistance to treatment proved an insurmountable obstacle to being an effective and capable parent. The court obviously found that whatever parent-child bond existed, it was outweighed by consideration of the remaining evidence. Essentially, mother asks us to reweigh the evidence and reach a different conclusion than did the trial court. This we will not do. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights"). The court acted well within its discretion in concluding that termination of mother's rights, including her right to visitation, was in the children's best interests. See In re M.B., 162 Vt. 229, 237 (1994) (evidence of parent's love for child and desire to have custody did not controvert evidence that termination was appropriate based on other statutory best-interest factors).

Mother next argues that the termination order with respect to D.W. lacks a rational basis. According to mother, because it appears that D.W. will be placed in a permanent guardianship rather than be adopted, it was not necessary to terminate her rights. She maintains that it might be in D.W.'s best interests to have future contact with mother, and this could be possible in the context of a permanent guardianship had her rights not been terminated.

3

Again, it is for the trial court, not this Court, to decide what is in a child's best interests. The court here determined that mother's rights should be terminated so that D.W. could be freed for permanent placement in her current, healthy, supportive, and loving home. While mother would like to preserve her visitation rights, the court did not find such course of action in the child's best interests. Certainly, it is reasonable to conclude that terminating mother's rights allows D.W. to move forward in her relationship with her foster mother. In any event, the termination of mother's rights did not depend on the available placement options for D.W., In re E.B., 158 Vt. 8, 15 (1992), and the fact that D.W. will be in a permanent guardianship does not render the court's termination decision irrational. While mother disagrees with the court's decision, she fails to show any error.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Brian L. Burgess, Associate Justice