# In re J. & J. W.

[365 A.2d 521]

No. 273-75

Present: Barney, C.J., Smith, Daley, Larrow and Billings, JJ.

Opinion Filed October 5, 1976

*Michael J. Sheehan,* Windsor County State's Attorney, White River Junction, for Plaintiff.

*Frederick Pope, Jr.,* Brattleboro, for the Mother.

*James L. Morse,* Defender General, *Charles S. Martin,* Appellate Defender, and *Alan S. Rome,* Juvenile Defender, Montpelier, for the Juveniles.

**Billings, J.** On 15 September 1971, J. & J. W., then aged one and two and one-half years old, were committed to the care and custody of the Department of Social Welfare. 33 V.S.A. § 656. On 31 October 1974, the Department of Social Welfare petitioned the District Court of Vermont, Unit No. 6, Windsor Circuit, to modify the original order and sever the parental rights reserved at the time of the original commitment and thereby allow the children to be placed for adoption. After hearings on 19 and 29 May 1975, the court, on 5 September 1975, issued findings of facts and conclusions of law which modified the original order and severed the parental rights.

In its findings of facts and conclusions of law, the court relied heavily on a child psychology treatise, quoting from it extensively. This treatise was not introduced into evidence, nor otherwise made a part of the record. We stated in *In re Petition of Certain Neglected Children,* 134 Vt. 74, 349 A.2d 228 (1975), our reservations "about this type of practice". At that time, it was not necessary to rule on that point, because the lower court's decision was based upon other substantial findings. In the case at bar, there are no such complementary findings. The parties here were denied the opportunity for cross-examination, rebuttal, or the introduction of further testimony, particularly relative to the conclusion that the appellant was no longer the psychological parent of her children, and as such is error.

The family situation at the time of the original order was essentially as follows. The mother, age 37, was first married in 1952. Three children were born of that marriage which terminated in divorce in 1967. Custody of those children was removed by the courts subsequently. She remarried in 1968; these two children were born of that marriage. In 1969, she

voluntarily committed herself to the Vermont State Hospital and was discharged after approximately one week. In 1970, upon her complaint of assault, her husband was sentenced to custody of the Commissioner of the Department of Corrections. In 1971, she again voluntarily committed herself to Vermont State Hospital and again was discharged after about one week. Apparently she also received out-patient treatment from time to time at the Brattleboro Retreat. The neglected children petition was brought at a time when the father was imprisoned and the mother admitted at Waterbury. Detailed evidence was introduced in the matter by the Department of Social Welfare relative to the unstable family situation, child abuse secondary to the mother's psychiatric problems and the children's psychological problems.

Since the original order, the mother divorced her second husband and has remarried. Her present husband has a stable life and desires to make a home for the children here involved. The couple reside in an apartment which contains a spare room which the mother has begun to prepare for extended visits or possible return of the children, although such petition was not made in this action. Although she visited her children intermittently previously, since her third marriage she has routinely visited her children monthly as permitted by the Department.

The mother's mental illness has previously been diagnosed as schizophrenia-chronic, undifferentiated type in remission. Since March of 1971 she has received out-patient psychiatric counseling and treatment at the Brattleboro Retreat.

We have described the authority to terminate parental rights based upon the *parens patriae* theory as an "awesome power". *In re Petition of Certain Neglected Children, supra; In re J. M.,* 131 Vt. 604, 607, 313 A.2d 30 (1973). For this reason, we have consistently required that the lower courts adhere closely to the statutory definitions as a safeguard in recognition of the importance of the interests sought to be affected. After weighing all the evidence, the lower court must make explicit findings which meet the statutory requirements before it may order this ultimate termination of parental rights.

The statute requires that before the existing order may be modified or amended that there have been a change of circumstances and that the new status sought be in the best interest of the child. 33 V.S.A. § 659(a). The prerequisite change in circumstances must be a substantial change in material circumstances. *In re Petition of Certain Neglected Children, supra; Gokey* v. *Gokey,* 127 Vt. 334, 248 A.2d 738 (1968).

The State, as petitioner, argues a material change in circumstances. Its line of reasoning is that during a period of approximately five years since the original order, the mother has not progressed psychologically to a point where she can function adequately in a stressful environment despite receiving out-patient psychiatric counseling and medication on a continuing basis. The State presented testimony of a consulting child psychiatrist to prove the extraordinary needs of these particular children described as anxious, immature and disturbed due to the deprivation and effect of early parental environment and subsequent dislocations.

The State advanced a theory that the mother is no longer the "psychological parent" of the children, and the lower court based its finding of changed circumstances in part on this theory. The essence of this theory is that a child's emotional development and concept of self is dependent upon a stable relationship with another significant individual. Without such a relationship, a child will not develop a sense of self, nor a realistic view of the world, nor be able to relate to others. The result may be anxiety, withdrawal, or hyperactivity coupled with immature and inappropriate language and behavior. The longer the lack of a stable relationship exists, the less likely the chance that the child will grow into a stable, healthy, mature adult.

The State argues that the lack of such a relationship with the natural parents, the present inability of the natural parent to establish such a relationship and the strong and immediate need of these children for such a relationship, possible only in a stable, continuing family setting through adoption, constitute a change of circumstances commensurate with the statutory requirement.

By way of a secondary argument, the State contends that further delay diminishes the chances for joint and permanent

adoption as the children's ages increase. Without a permanent living situation, the formation of the crucial psychological bond is delayed to the detriment of the child.

■■ A review of the record and the lower court's findings does not support the allegation of a substantial change in material circumstances. Standing alone, the argument that the primary psychological relationship(s) lie other than with the natural parents does not meet this requirement.

To establish a substantial change in material circumstances, petitions to modify an order and terminate parental rights proceed on the theory that natural parents have an obligation to correct their living circumstances for the better, *In re Proceedings Concerning a Neglected Child,* 130 Vt. 525, 536, 296 A.2d 250 (1972) and that there has been deterioration or that there exists stagnation coupled with a prospective inability for improvement. *In re Petition of Certain Neglected Children, supra.*

Because we have held that loss of the psychological parent relationship between natural parent and child by itself does not establish a substantial change in material circumstances, *i.e.* a deterioration, the record and findings must show more.

■ While there are some factors which might support a finding of changed circumstances, *e.g.* the psychological unpreparedness of the parent, the passage of time without promise of proper care, and the importance of a stable environment during a child's formative years, we have emphasized a caveat concerning use of a stagnation theory to find changed circumstances. *In re Petition of Certain Neglected Children, supra.* In a broad sense, there is stagnation in this case in the parental capability to care for the children, however, this case is specifically distinguishable from either case cited above in several particulars. Here, the mother regularly visits the children as often as permitted by the Department; she has prepared additional accommodations in anticipation of longer visitations; she has established a stable marital situation; she has continued a regular medical treatment program; and she has been employed in a temporary and part-time position which in part involved supervision of children. If any change is apparent, it is one which militates in favor of improved parental

circumstances rather than deterioration or a stagnation coupled with prospective inability for improvement.

Throughout juvenile law, it is consistently held that the best interest of the child is the paramount concern. *In re Rathburn*, 128 Vt. 429, 434, 266 A.2d 423 (1970). Through its expert testimony, the State argues that the child's paramount interest is a primary psychological relationship in a stable environment which also serves the wider social interest of a society comprised of stable, mature, and productive adults. Because that relationship is not dependent on the fact of biological parenthood, we are asked to evaluate historical facts about the parent-child relationship and predictions about the parents' future ability to fulfill the role model of psychological parent and terminate legal parental rights because the Department believes it can provide a superior environment through the use of its trained staff in screening prospective adopting individuals or child placing agencies. Extended to its logical conclusion, many issues are raised about individual and collective societal needs and rights which are best addressed in other forums.

From the foregoing discussion, it is clear that the order below must be reversed.

*Reversed.*

**Larrow, J.** (Concurring). I fully concur with the views expressed by Mr. Justice Billings in the principal opinion. But I would again emphasize the statement of Mr. Justice Daley in *In re J. M.*, 131 Vt. 604, 609, 313 A.2d 30 (1973) that separation of child from parent is required by statute to be *"only* when *necessary* for his welfare or in the interests of public safety". 33 V.S.A. § 631(a)(3) (emphasis supplied). The power to terminate forever all parental rights, including as here the right to consent to an adoption, is indeed an "awesome power". I do not read the statute as conferring it on the basis of an opinion formed by reading a treatise. Nor do I read it as legislating a general power to make whatever disposition of a child may be thought desirable to improve his state in life. I read the statute as providing temporary care for the abandoned, abused, deprived or uncontrollable child while the need for temporary care continues, and as envisioning total removal from a natural parent only in the light of the hopeless

situation which the opinion describes as "stagnation". The facts found here do not indicate such hopelessness, but rather a marked degree of improvement. The passage of time, standing alone, does not justify the order below, even though it may weaken the "psychological parent relationship". Such specious logic would even serve to destroy the parental rights of a father in overseas military service. The "best interest of the child" is a useful maxim, but it comes into play only when there is legal justification for the permanent severing of parental rights.

The underlying philosophy of the trial court seems to have been that even though the natural mother was making valiant and fruitful efforts to regain her capacity to care for her children, their overall good would be promoted by adoption. I do not view the statute as trying to create the best possible world. I do not think it intends to set up a mechanism for transferring parental rights from those in temporary difficulty to those more affluent and adjudged by the social worker as more capable of educating and rearing the progeny, if not of procreating them. The result below does not accord with our social policy of bolstering the family unit, preserving it, where necessary, by financial and other support. There may well be a point where hope that the "biological parent" may resume her place with her family disappears, and severance of the last remaining ties is required. But it does not appear to be reached on the facts here found.