# In re E.B., Jr. and J.B., Juveniles

[603 A.2d 373]

No. 90-402

Present: **Allen, C.J., Gibson, Dooley and Johnson, JJ., and Peck, J. (Ret.),
Specially Assigned**

Opinion Filed January 3, 1992

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *Michael O. Duane*, Assistant Attorney General, and *Keith Aten*, Law Clerk (On the Brief), Waterbury, for Plaintiff-Appellee.

*E.M. Allen*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Defendant-Appellant P.B.

*Michael Rose*, St. Albans, for Defendant-Appellant E.B.

*Charles S. Martin* of *Martin & Paolini*, Barre, for Juveniles.

**Gibson, J.** The parents and the guardian ad litem of two boys appeal from the juvenile court's order terminating residual parental rights. We affirm.

## I.

In March of 1987, the Department of Social and Rehabilitation Services (SRS) filed a petition alleging that the boys, then one-and-one-half and two-and-one-half years of age, were children in need of care and supervision (CHINS) because of their parents' instability and failure to meet their medical and physical needs. At the merits hearing, the parties signed a stipulation stating that the boys were CHINS, that SRS would assume custody of the children, and that the boys would be placed with the parents as soon as the parents found appropriate housing. It was further agreed that the parents would maintain stable housing and employment, attend parenting classes, visit with the children as scheduled, attend alcohol counseling sessions, and comply with a medical plan as recommended by the children's physician. Pursuant to the stipulation, the boys were adjudicated CHINS, and SRS assumed custody in July of 1987.

That same month, SRS placed the boys with their parents and referred the parents to various social programs to assist them in providing for the children's medical needs, developing parenting skills, and coping with alcohol abuse. In January of 1988, SRS removed the boys from the home because of the parents' failure to follow up on the children's eye problems and early education needs, and because of a number of unexplained bruises found on the boys. SRS informed the parents that reunification would still be possible if they participated in the social programs suggested by the case plan and visited the

children regularly. Despite encouragement from SRS, the father did not enroll in an alcohol treatment program, the mother dropped out of the family support program, and neither parent visited the boys on a regular basis.

In June of 1988, the parents moved to Arizona without seeing the children first or informing SRS of the move. A few weeks later, the parents asked SRS to send the boys to Arizona or, in the alternative, to allow them to work on the case plan through Arizona agencies. SRS insisted on working toward reunification with the parents in Vermont.

In August of 1988, the parents returned to Vermont for the eighteen-month dispositional review hearing, wherein it was decided that SRS would retain custody of the children while the parents continued regular visitation and participated in certain social services programs. Between August of 1988 and January of 1989, when the parents again left the state without informing SRS or seeing the boys, the parents' visits with the children were sporadic. In mid March of 1989, the mother informed SRS that she and her husband were in Florida. In the next nine months, the parents moved from Florida to Arizona, and then to Utica, New York. During that time, the mother contacted SRS two or three times to inquire about the children.

In August of 1989, citing the parents' failure to participate regularly in the required programs or to contact the children on a regular basis, SRS petitioned for termination of residual parental rights. Hearings were held on three days between January and May of 1990. Noting that, as a direct result of the parents' actions or inaction, the relationship between the boys and their parents had deteriorated between the time SRS assumed custody of the children and the time of the termination hearing, the juvenile court concluded that the best interests of the children required the termination of residual parental rights. On appeal, appellants argue (1) that SRS violated the parents' constitutional right to travel by not allowing them to work with out-of-state agencies on their case plan; (2) that the court's decision was improperly based on its findings regarding the positive environment of the preadoptive foster home; and (3) that the court improperly terminated residual parental rights without first making a determination that both parents are unfit and incapable of caring for their children.

## II.

Appellants first argue that SRS's refusal to work with the parents on an out-of-state basis, or to refer their case plan to social service agencies in the states where the parents were located, led to the conditions that resulted in the termination of parental rights and violated the parents' constitutional right to travel freely from state to state. We disagree.

In the stipulation transferring custody of the boys to SRS, the parents made a commitment to obtain and maintain stable housing and employment, to visit the children regularly, and to attend various counseling programs. The parents failed to meet any of these commitments, and, on at least two occasions, they left for another state without contacting SRS and without seeing their children. Under these circumstances, SRS was justified in refusing to work toward reunification while the parents were far away from the children and without the funds to visit them on a regular basis. See *Rowsey v. Rowsey*, 329 S.E.2d 57, 61 (W. Va. 1985) (paramount concern for child welfare may supersede the right to travel).

SRS defended its refusal to work toward reunification while the parents were out of state by pointing out that family stability and frequent contact with the children is the key toward reunification. Appellants argue that the need for "bonding" between parents and children is not a compelling enough reason for SRS to insist that the parents work toward reunification in the state where the children live. In support of this argument, appellants cite *In re J. & J.W.*, 134 Vt. 480, 365 A.2d 521 (1976), wherein this Court reiterated that "loss of the psychological parent relationship between natural parent and child by itself does not establish" a sufficient change of circumstances to warrant termination of parental rights. *Id.* at 484, 365 A.2d at 524.

*In re J. & J.W.* does not stand for the proposition that "bonding" between parent and child is not important, or that SRS may not insist on regular contact between parents and child in order to work toward reunification. Rather, it admonishes against the termination of parental rights *solely* on the basis that the child's primary psychological relationship is not with the natural parent at the time of the hearing. Pointing out that the mother regularly visited the children, prepared addi-

tional accommodations in anticipation of longer visitations, established a stable marital situation, continued a regular medical treatment program, and found stable employment, the Court concluded that overall the mother had improved her circumstances and the State had not proved a "deterioration or a stagnation coupled with prospective inability for improvement." *Id.* at 484–85, 365 A.2d at 524. The Court emphasized that "the best interest of the child is the paramount concern." *Id.* at 485, 365 A.2d at 524. Given the circumstances of the instant case, we cannot say that SRS did not act in the best interest of the children when it refused to work toward reunification while the parents were out of state.

Citing *In re L.A.*, 154 Vt. 147, 574 A.2d 782 (1990), appellants also argue that SRS should have worked actively toward reunification while the parents resided in the State of New York, despite the fact that SRS had petitioned for termination of parental rights. Appellants misconstrue *L.A.*, which held that a court may terminate parental rights prior to the existence of a permanent placement for the children if it is in their best interests. *Id.* at 160, 574 A.2d at 789. The case does not stand for the proposition that SRS must actively work for reunification until the termination order is issued. We merely pointed out that, if SRS changes its goal, it must keep in mind that the court may decide not to accept the change in goal and may require reunification. *Id.*

## III.

Next, appellants argue that the juvenile court improperly based its decision to terminate parental rights on its findings regarding the quality of the boys' preadoptive home. We acknowledge that parental rights cannot be terminated simply because a child might be better off in another home. See *In re N.H.*, 135 Vt. 230, 236, 373 A.2d 851, 856 (1977); *In re J. & J.W.*, 134 Vt. at 485–86, 365 A.2d at 525 (Larrow, J., concurring). In determining whether the best interests of the child require the termination of parental rights, the most important issue is whether the parents "will be able to resume [their] parental duties within a reasonable period of time." *In re J.R.*, 153 Vt. 85, 100, 570 A.2d 154, 161 (1989); see 33 V.S.A. § 5540(3). Among other factors, however, the court must consider the child's rela-

tionship with his or her foster parents. 33 V.S.A. § 5540(1). In this case, the court's findings and conclusions reflect the proper priority of these factors. The vast majority of the court's thirty-one findings address the history of the parents' lack of progress toward meeting the goals set out by the case plan. Further, the court's conclusions extensively detail the parents' inability to turn their lives around or create an environment in which they could reunite with their sons. Although the court properly points out that the boys have adjusted well to a healthy environment provided by the foster parents, the focal point of the court's decision is the parents' conduct over the two years preceding the termination hearing.

## IV.

Appellants also argue that the court improperly terminated parental rights without first making a specific finding, supported by clear and convincing evidence, that the parents are unfit and incapable of caring for their children. See *In re M.B.*, 147 Vt. 41, 45, 509 A.2d 1014, 1017 (1986) (permanent termination of parental rights requires a clear and convincing showing of parental unfitness). We disagree. The court's findings and conclusions, which are amply supported by the record, clearly indicate not only that the parents are incapable of adequately caring for their children at the present time, but that it is unlikely that they will be able to care for the children anytime in the near future.*

Considering the history of this case, the court's conclusion at the termination hearing that the parents had regressed in their ability to care for their children does constitute a finding of parental unfitness. In 1987, the parents signed a stipulation acknowledging that the boys were in need of care and supervision

---

* Because we conclude that the court's findings, which are supported by clear and convincing evidence, adequately demonstrate that the parents are incapable of caring for the two boys, we need not resolve the parties' dispute as to whether the parents' CHINS stipulation discharged the State's burden of proving parental unfitness at the termination hearing. Cf. *In re J.H.*, 156 Vt. 66, 71, 587 A.2d 1009, 1012 (1991) (parental unfitness test must be met before SRS can be awarded custody of a child; where mother had stipulated to SRS custody, she could not later complain that she had never been found to be unfit).

14

because of unmet medical needs, frequent family moves, and physical neglect. Cf. *In re Y.B.*, 143 Vt. 344, 346, 348, 466 A.2d 1167, 1168, 1170 (1983) (where mother accepted CHINS stipulation on the condition that it could not be used to find fault, and stipulation simply stated that her child was "without proper care necessary for her well-being at this time," stipulation could not support a finding of parental unfitness). In order to remedy the situation, the parents agreed to find stable housing and employment and to participate in parenting classes, alcohol counseling sessions, and other support programs. Because the parents did not follow through on the case plan, the boys were placed in a foster home. After that time, the parents did not maintain regular contact with the children, even when they had an opportunity to do so, nor did they otherwise comply with the agreement.

■ The court also found at the termination hearing that the parents did not have the ability "to organize and regulate the most basic elements of day-to-day living," that they were unable "to give proper priority to the well-being of their children," and that they "have failed over the past two years to play any constructive role in the boys' welfare or to demonstrate any love or affection for them." The court concluded that "[b]ecause of the parents' complete failure to maintain regular contact with the boys and their highly unstable and unpredictable lifestyle, it is not likely that they will be able to resume their parental duties toward these children within a reasonable period of time, if ever." It is difficult to imagine how the court, without saying the magic words, could more clearly have pronounced the parents unfit and incapable of caring for their children. Cf. *In re G.V.*, 136 Vt. 499, 502–04, 394 A.2d 1126, 1128–29 (1978) (findings determining best interests of children need not be couched in precise language of statute; termination of parental rights was proper where parents were unable to create a healthy or stable home environment or show ability to care for their children's welfare in the future).

## V.

■■ Finally, the boys' guardian ad litem seeks reversal of the court's order because SRS has rejected the foster parents

as adoptive parents. As noted above, termination of residual parental rights does not depend on the existence of an alternative placement. *In re L.A.*, 154 Vt. at 160, 574 A.2d at 789. Further, the court's decision focused on whether the parents were capable of resuming their parental duties within a reasonable period of time, rather than on the quality of the preadoptive home. See *In re J.R.*, 153 Vt. at 100, 570 A.2d at 161. We fail to see how the rejection of the foster parents as adoptive parents undermines the court's conclusion that the natural parents are incapable of caring for their sons.

*Affirmed.*