NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 94

No. 2015-022

In re J.M., Juvenile

Supreme Court

On Appeal from
Superior Court, Windsor Unit,
Family Division

May Term, 2015

Howard A. Kalfus, Specially Assigned

William H. Sorrell, Attorney General, Montpelier, and Joseph L. Winn, Assistant Attorney
General, Waterbury, for Appellant State.

Miriam W. Newman, Lebanon, New Hampshire, for Appellee Father.

Michael Rose, St. Albans, for Appellee Mother.

PRESENT: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Burgess, J. (Ret.),
Specially Assigned

¶ 1.    **DOOLEY, J.**    The State of Vermont, Department for Children and Families appeals from a family court judgment denying the State's petition to terminate father's parental rights to the minor J.M. The State contends: (1) the court's findings do not support its conclusion that termination of father's parental rights was not in the child's best interests; (2) the absence of an adoptive home cannot justify denial of the petition; and (3) the court's decision does not provide permanency for the minor. We affirm.

¶ 2.    The facts may be summarized as follows. J.M. and his brother W.M. first came into DCF custody in July 2009 based on reports of their parents' substance abuse, domestic violence, inappropriate physical discipline, and inadequate housing. W.M. was four years old

and J.M. was three years old at the time. The children were returned home in April 2010 under a conditional care order. Continued reports of alcohol abuse and domestic violence in the home led to the filing of a CHINS petition in January 2012. The parents stipulated to a CHINS adjudication, and the children were placed with mother under a conditional care order, with visitation by father. Further reports of physical abuse of the children resulted in a transfer of custody to DCF in February 2013. In January 2014, the State filed petitions to terminate the parental rights of both parents to W.M. and J.M.

¶ 3. A hearing on the TPR petition was held in December 2014. W.M. was ten years old and J.M. was nine at the time of the hearing. Mother appeared with counsel and agreed to relinquish her parental rights conditional on the court granting the petition as to father. The hearing then proceeded as to father. A DCF social worker described the children's current placements based on their "very different needs." W.M. had fewer emotional problems than his younger brother, and had been living for two years with a foster family where he was well adjusted and thriving. J.M. had a "higher level of clinical needs," had been diagnosed with post-traumatic stress disorder, oppositional defiant disorder, and attention deficit hyperactivity disorder, and had been in living in residential treatment centers for the past two years. Although he had made some progress, J.M. continued to engage in emotional outbursts and assaultive behaviors toward staff. Any future community-based placement of J.M. would require highly skilled foster parents with the ability to provide the level of structure and support necessary to manage his behaviors.

¶ 4. The DCF social worker noted that father had been consistent in his weekly, unsupervised visits with J.M. at the residential center, and periodically included his parents— J.M.'s paternal grandparents—in the visits. The social worker stated that the "connection [with father] is important for J.M.," who told the social worker that he was "scared he's never going to see his dad again." The social worker indicated that she did not support terminating contact.

2

The social worker also observed that J.M. loves his grandparents, enjoyed seeing them, and "had a connection with them for a long time." J.M.'s clinician at his residential center also observed that J.M. "really enjoys" his visits with father, although she noted that father's demeanor was more friendly than affectionate and "almost like an older brother." The clinician also acknowledged that J.M.'s behavior often deteriorated after visits with father, although she was not certain as to the cause.

¶ 5. At the conclusion of the hearing, the court entered findings on the record. The court found a substantial change of circumstances based on father's failure to make any significant progress in addressing his substance abuse and domestic-violence issues, and proceeded to address the children's best interests. As to W.M., the court found that he enjoyed a very close relationship with his foster parents, who were meeting all of his needs, and that he had "adjusted beautifully into his foster home and community." His visits with father were less frequent than J.M.'s and had been decreasing, and the court concluded that father did not "play[] a tremendously constructive role in W.M.'s life." Finally, in view of father's failure to make any significant progress over the course of several years despite the efforts of DCF, the court concluded that there was no likelihood that father could resume parental responsibilities within a reasonable period of time. Accordingly, the court granted the State's petition as to W.M.

¶ 6. The court reached a different conclusion concerning J.M. Although the court found that father could not resume parental responsibilities for J.M. within a reasonable time "for the same reasons . . . expressed in W.M.'s case," and acknowledged that this factor has been characterized as the most important among the statutory best-interests criteria, it was not—the court observed—the "be all and end all." Considering the role that father played in J.M.'s life, the court found that, while he did "not express much affection explicitly" during his visits with J.M., he had "remain[ed] a consistent part of his life" and "may in fact provide some emotional support." This was substantially more important for J.M. than W.M. "given the turmoil that J.M.

3

. . . continue[s] to experience" and the absence of any other significant personal relationships or supportive community. Thus, while the court acknowledged that it was a close call, it concluded that, on balance, terminating father's parental rights was not currently in J.M.'s best interests.

¶ 7.    In response to the court's stated findings and conclusions, counsel for the State asserted that denying the petition was inconsistent with the finding that father could not resume parental responsibilities within a reasonable period of time, as well as with the principle that termination decisions were not to be based on the availability of an adoptive placement. The court responded that the basis of its decision was "not simply that there is no foster home lined up right now for J.M.," but rather that "there should continue to be a relationship between J.M. and his father," a finding—the court observed—that was supported by the child's DCF social worker. This appeal by the State followed.

¶ 8.    Our review is generally limited. We will not overturn the trial court's findings unless they are clearly erroneous, nor its conclusions if reasonably supported by the findings. In re G.S., 153 Vt. 651, 652, 572 A.2d 1350, 1351 (1990) (mem.). As we have frequently observed, "[o]ur role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights." In re S.B., 174 Vt. 427, 429, 800 A.2d 476, 479 (2002) (mem.).

¶ 9.    Assessed in light of these standards, we find no basis to disturb the trial court's decision. Although the State claims that, contrary to the court's findings, "many aspects of [father's] visits were not meaningful" and failed to provide emotional support, the evidence summarized above was sufficient to support the finding that continued contact with father was important to the child and provided some emotional support and sense of stability where it was otherwise sorely lacking.

¶ 10.    The State also asserts that the court's decision was contrary to our often-stated proviso that "an alternative placement is not a prerequisite to termination of parental rights." In

4

re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496, 872 A.2d 334 (mem.); accord In re E.B., 158 Vt. 8, 15, 603 A.2d 373, 377 (1992) ("[T]ermination of residual parental rights does not depend on the existence of an alternative placement."). As noted, the trial court here expressly rejected this characterization of its ruling, explaining that it was not based simply on the lack of a foster home but on a "balance" of factors, including DCF's view that a continued relationship with father was beneficial to J.M., particularly in the absence of any other meaningful personal or communal relationships in the child's life.

¶ 11. The State's premise, in any event, is incorrect. While we have held that the availability of an alternative placement is not a precondition to terminating parental rights, we have never held that the absence of an alternative placement cannot be considered by the court in deciding whether a termination of parental right is in the child's best-interests. Our juvenile statute directs the court to consider, among other factors, the child's relationship with his or her "foster parents," 33 V.S.A. § 5114(a)(1), and we have recognized that successful adjustment to a foster home is a proper consideration in the court's best-interests analysis. See In re E.B., 158 Vt. at 12-13, 603 A.2d at 376. We discern no reason why the court may not, conversely, consider the absence of such a relationship in its best-interests analysis, especially where—as here—the child's sole emotional connection resides with the parent.

¶ 12. The "best interests of the child" remains the touchstone and the court's "paramount concern" in a termination-of-parental-rights proceeding. Id. at 12, 603 A.2d at 376 (quotation omitted); see also In re B.S., 166 Vt. 345, 352, 693 A.2d 716, 721 (1997) ("The primary concern of the family court, when acting as a juvenile court, is to protect the welfare of the child."). In deciding this issue—perhaps the most difficult to confront any court—few, if any, circumstances concerning the welfare of the child should be considered entirely immaterial or, for that matter, entirely controlling.

¶ 13. This answers the State's final argument, as well. The State asserts that the "<u>dispositive</u> issue in termination proceedings is whether a parent can resume parenting within a reasonable time." (Emphasis added). Therefore, in finding against father on this issue but denying termination, the court allegedly contravened the juvenile statutes' "paramount" goal of establishing permanency for the child.

¶ 14. As noted, however, the court's "paramount" concern is to serve the best interests of the child; permanency is the presumed means of accomplishing that end, but it is not the <u>only</u> permitted outcome. Nor does the statutory scheme establish any of the four enumerated best-interests criteria as "dispositive" or outcome-determinative. See 33 V.S.A. § 5114(a). We have, to be sure, identified a parent's ability to resume parental responsibilities within a reasonable time as the "most important" factor, <u>In re M.B.</u>, 162 Vt. 229, 235, 647 A.2d 1001, 1004 (1994), but <u>not</u> to the exclusion of the remaining statutory criteria. As explained in <u>In re M.B.</u>, "[t]he best interests of the children must be considered in accordance with the <u>four criteria</u> set forth" in the statute. <u>Id</u>. (emphasis added); see also <u>In re C.L.</u>, 2005 VT 34, ¶ 14, 178 Vt. 558, 878 A.2d 207 (mem.) (observing that Vermont's termination-of-parental-rights statute "provides . . . that in deciding whether termination is in the best interests of the child, the court must consider <u>a number of factors</u> affecting the child and the 'natural parents' " (emphasis added)); <u>In re L.A.</u>, 154 Vt. 147, 160, 574 A.2d 782, 789 (1990) ("[T]he juvenile court may terminate all parental rights and responsibilities if it is in the best interests of the child as determined by weighing four factors enumerated in" the statute.). Thus, although it will undoubtedly be the unusual case, nothing in our statute or decisional law precludes a court from concluding—as here—that the balance of factors weighs against a termination of parental rights notwithstanding a parent's inability to resume parental responsibilities within a reasonable time. See <u>In re J.F.</u>, 2006 VT 45, ¶ 13, 180 Vt. 583, 904 A.2d 1209 (observing that "in some cases a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate

6

remedy"). To conclude otherwise would effectively eviscerate the legislatively-established best-interests standards, a policy judgment well outside this Court's mandate.

¶ 15. Accordingly, we find no basis to conclude that the trial court contravened the juvenile statutes or abused its discretion in concluding that the balance of factors weighed against granting the State's petition as to J.M., and we therefore find no basis to disturb the judgment.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 16. **SKOGLUND, J., dissenting.** In this case of a special-needs child, the trial court acknowledged that there was no likelihood that father could resume parental responsibilities within a reasonable period of time—the critical best-interests factor—but, with scant evidence to support its decision and findings that would appear to argue against it, denied the motion to terminate father's parental rights. I would reverse the trial court's decision to deny termination.

¶ 17. Let's be clear about the reasons J.M. first came into custody in July 2009. The Department for Children and Families (DCF) sought custody of W.M and J.M. through an emergency care order (ECO). The ECO was granted based on allegations of noncompliance with the conditional custody order (CCO) that had been granted in February 2009 and noncompliance with current safety plans. Specifically, the safety plan included a condition of no contact between father and the children, based on his violent behaviors and substance abuse. Then, in May 2010, custody was returned to mother and father under a new CCO that included conditions that father remain sober and that mother and father not engage in violent behavior. Sometime in December 2011, father left the home to prevent the family from being evicted due to his drinking and belligerent behavior. The couple is now divorced. DCF has never recommended placement with father as a disposition goal.

7

¶ 18.   This ten-year-old child has significant issues.  As the court found, he has three diagnoses: post-traumatic stress disorder, opposition defiance disorder, and attention deficit hyperactive disorder.  He has been in residential care for about two years.  When it becomes therapeutically appropriate, J.M. could be moved to a skilled foster home.  The father, it appears, has significant issues as well, primarily related to substance abuse and aggression.  The court found that father's progress in dealing with these issues had been insufficient and inadequate— support for the court's finding of father's stagnation.

¶ 19.   The paramount concerns of the juvenile statutes are safety and permanency for children.  33 V.S.A. § 5101(a)(4); In re A.W., 2013 VT 107, ¶ 10, 195 Vt. 226, 87 A.3d 508.  The optimal paths to permanency for a child are reunification or adoption.  33 V.S.A. § 5321(a).  As the court below found, father's stagnation in addressing or attempting to resolve his issues removes reunification as an option.  Thus, the ruling denies either road to J.M. and creates uncertainty about his future.

¶ 20.   In evaluating the evidence under the statutorily stated "best interests of the child" factors, id. § 5114, the court found a basis for continuing father's parental rights in § 5114(a)(4), which considers "whether the parent has played and continues to play a constructive role, including personal contact and demonstrated emotional support and affection, in the child's welfare."  The evidence showed that father has never played what any reasonable person would consider a constructive role in J.M.'s life.  Indeed, the most that can be said of father's relationship with J.M. is that he visits.  Unfortunately for J.M., the court exalted consistency of contact above quality of contact.  The court found father has "somewhat of a flat affect" towards J.M. at visits. Father sometimes plays with J.M., but sometimes just sits and watches him.  "He does not express much affection explicitly."  The court found that father did not play a particularly constructive role in J.M.'s life, but hopefully concluded that father's consistent contact with J.M. "may . . . provide some emotional support."

¶ 21.     Not only is this speculative conclusion not supported by the court's findings, it is in contrast to the court's conclusion concerning J.M.'s older brother, W.M.  The court found that W.M. had a good relationship with father and enjoyed time with him, but could not find that there was very much emotional support because of father's flat affect.  The court explained, "It seems to be a good relationship but I don't believe there is much, if any, emotional support that is being perceived at least by W.M."  Finding father was not able to resume parenting of W.M. within a reasonable period of time, the court terminated his parental rights to W.M.  While the court may have hoped that father's mere presence at visits "may" provide something approaching emotional support to J.M., his younger, more damaged child, there is nothing in the court's findings that supports that wishful thinking.

¶ 22.     It is possible there will be a case in which the parent-child bond is so loving and strong that, despite an inability to resume parental duties within a reasonable period of time, termination of parental rights would not be in the child's best interests.  See In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 583, 904 A.2d 1209.  But, according to the actual findings of the court below, this is not that case.

¶ 23.     In this Court's review of a termination decision, conclusions of law will be upheld if supported by the findings, In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993), but conclusions not supported by the findings cannot be sustained, In re K.M.M., 2011 VT 30, ¶ 14, 189 Vt. 372, 22 A.3d 423.  The role of this Court is indeed limited; however, I cannot find that the trial court's exercise of discretion can be sustained.  I would reverse.

¶ 24.     I am authorized to state that Chief Justice Reiber joins this dissent.

_____
Associate Justice

9