*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2016-114

AUGUST TERM, 2016

In re J.Y., Juvenile } APPEALED FROM:
}
} Superior Court, Windham Unit,
} Family Division
}
} DOCKET NO. 5-1-14 Wmjv

Trial Judge: Karen R. Carroll

In the above-entitled cause, the Clerk will enter:

Father appeals the superior court's order terminating his parental rights with respect to his son, J.Y. We affirm.

The record and the superior court's unchallenged findings reveal the following facts. J.Y. was born in May 2010. In January 2014, the State filed a request for an emergency care order, alleging that J.Y. was a child in need of care or supervision (CHINS) due to his mother's inability to care for him and the noncustodial father's indifference to that fact. The superior court issued an emergency care order the same day the petition was filed, and J.Y. was taken into state custody. J.Y. was adjudicated CHINS following an April 2014 hearing. The court found that mother's serious and debilitating abuse of alcohol had put her children[*] at risk for months, and that father had not taken any steps to protect J.Y. and had refused, in accordance with his philosophy, to contact authorities to ensure that J.Y and his brother were safe. The Department for Children and Families (DCF) filed a case plan that identified a history of domestic violence between mother and father and required father to: (1) participate in, complete, and follow recommendations of a substance-abuse evaluation; (2) participate in and benefit from a batterer's program; (3) participate in a parent-education program; (4) attend all scheduled visits with J.Y.; (5) attend all shared parenting meetings; (6) maintain employment and adequate housing; and (7) sign releases enabling DCF to communicate with service providers.

DCF's May 2014 disposition report recommended that J.Y. remain in DCF custody with a goal of reunification with mother. At the time of the June 18, 2014 disposition hearing, J.Y. was living with mother four days a week and in foster care the remaining three days per week. Father had visitation with the child two hours per week. The disposition case plan, which was filed a few days before the disposition hearing and approved by the court, stated that father had attended scheduled visits regularly and had a warm relationship with his son, but otherwise had made no progress toward case plan goals. The requirements of the original case plan remained in place, with the added condition that father participate in, complete, and follow recommendations of a psychiatric evaluation. An August 2014 post-disposition-review report indicated that father had

_____

[*] Mother's other son by a different father was living with her and J.Y. That child is the subject of separate proceedings.

not participated in a substance-abuse evaluation, had not participated in the required batterer's and parent-education programs, had not attended all shared parenting meetings, and had not obtained a psychiatric evaluation.

By February 2015, DCF had concluded that it would not seek any reunification with father, in part due to his sending threatening and hateful messages to mother in the fall of 2014. Father had also previously threatened to use firearms at a courthouse and blow himself up in front of J.Y. As the result of his threatening behavior, father's visits with his child were suspended sometime in the second half of 2014. Although father obtained a substance-abuse screening, he failed to follow through on recommendations or a second meeting. He was not accepted into a batterer's program because he failed to acknowledge any issues with anger or violence. He had maintained appropriate employment and housing, however, and his visits with J.Y. had progressed to being partially unsupervised at his home before they were suspended. Father petitioned for reinstatement of his visits in February 2015, but the superior court denied the request, instead conditioning the resumption of visits on father actively participating in the case plan.

The February 2015 case plan, which was approved by the superior court on February 19, 2015, set concurrent goals of reunification with mother or adoption. In July 2015, DCF changed its permanency recommendation to adoption only. The permanency report indicated that father was continuing to send abusive text messages to mother. Father had still not participated in any treatment for substance abuse, despite his admission that he was drinking a significant amount of alcohol and the fact that he had been arrested in the summer of 2014, while these proceedings were pending, for felony cultivation of marijuana. In June 2015, J.Y. and his brother were placed with their maternal aunt in Douglasville, Georgia.

In August 2015, DCF filed petitions seeking to terminate both mother's and father's parental rights. Mother voluntarily relinquished her parental rights in September 2015, conditioned on father's rights being terminated. A termination hearing with respect to father was held in January 2016. In a March 21, 2016 decision, the superior court terminated father's parental rights, finding by clear and convincing evidence that: (1) father's ability to parent J.Y. had stagnated because of his failure to improve his capacity to care for the child by engaging in services aimed at addressing issues that led to J.Y. being taken into state custody more than two years earlier; and (2) termination of father's parental rights was in J.Y.'s best interests because father had not played a significant or constructive role in J.Y.'s life and would not be able to resume his parental duties within a reasonable period of time, given his continuing lack of insight into his need for case-plan services.

On appeal, father argues that the superior court overlooked the fact that his inability to play a constructive role in J.Y.'s life as a noncustodial parent was due to factors beyond his control. Father points to the superior court's findings indicating that his visits with his son, with whom he was found to have a warm relationship, were progressing until they were suspended based on issues that he claims were irrelevant. He states that while addressing substance abuse and anger management may be relevant to his ability to become a custodial father, there is no evidence that his substance abuse, violence, or anger had any impact on his parent-child contact with his son. He contends that the disruption of his noncustodial relationship with his son—the result of the suspension of his visits and the placement of the child with his maternal aunt in Georgia—was beyond his control.

We find no merit to these arguments. The superior court was not required to select a disposition alternative that allowed father to continue parent-child contact in a noncustodial role.

As we explained in In re S.B., 174 Vt. 427, 428 (2002) (mem.), a termination proceeding "is not a custody case in which the family court "must balance the prospective advantages of different placement options, but rather "a legislatively created [] proceeding in which the court is required to weigh specific statutory factors when determining whether to grant a petition for termination of parental rights." Id.; see In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496 (stating that court need not revisit statutory permanency hearing options "and explain why it is choosing termination of parental right over other options"). The question is whether changed circumstances and the child's best interests warrant a modification of the disposition order.

Here, the trial court first determined that father's failure to make any progress on most of the case-plan goals amounted to stagnation of his ability to parent J.Y., which constituted a change of circumstances sufficient to examine the child's best interests under the statutory factors set forth in 33 V.S.A. § 5114(a). See Id. § 5113(b) (providing that court may modify existing order on grounds that change of circumstances requires such action to serve child's best interests). The court then considered each of the statutory best-interest factors and concluded that termination of father's parental rights was in J.Y.'s best interests. Father does not challenge any of the superior court's findings and conclusions, which support this determination. See In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325 ("As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings" (quotation omitted)).

The record does not support father's contention that stagnation of his relationship with J.Y. was due to circumstances beyond his control. Father refused to engage in most of the required case-plan services even though he was aware that doing so was imperative to maintaining contact with his child. Not only did he continue to refuse to engage in necessary services, but he also engaged in threatening conduct against mother and others that led to cessation of his visits with J.Y. long before the child was placed with his maternal aunt in Georgia. The threatening conduct at issue was not unrelated to his ability to parent and the child's best interests. The trial court identified various instances of threatening conduct by father preceding suspension of his visitation with J.Y. including the following: In March 2014, in a conversation with mother's sister, he referred to an upcoming court hearing and threatened to use guns and bombs at the courthouse. When confronted by the police, father minimized his behavior by saying that he was just "venting." In the fall of 2014 father sent texts to mother that included profanity, disturbing name calling, and threats, much of which the trial court described as too disturbing for the court to repeat. While the court was not certain from the record whether visits were suspended after the March 2014 incident, or whether father was able to continue visits until after the threatening messages to mother in the fall of 2014, the court clearly found that father's threatening behavior led to the suspension of his visits. The trial court subsequently conditioned renewed visitation on father's participation in the batterers' program and substance abuse treatment—a condition father did not satisfy. The suggestion that father's contact with J.Y. was suspended as a result of factors beyond his control is unsupported by the record and the trial court's findings.

Nor did the trial court err in failing to conclude that father's relationship with J.Y. should have overcome all other statutory best-interest factors, including his inability to resume parental responsibilities in a reasonable time. While father's two-hour weekly visits with J.Y. were going well before they were discontinued and may have reflected a warm relationship between father and son, the record supports the trial court's failure to conclude that maintaining this relationship was so critical to the child's best interests as to outweigh the other factors. Cf. In re J.M., 2015 VT 94, ¶¶ 8-9, __ Vt. __, 127 A.3d 921 (affirming superior court's denial of termination petition where court found that although father would be unable to resume his parental rights within

3

reasonable period of time, father's noncustodial role should be maintained because it provided emotional support for child who had experienced considerable turmoil and who had no other significant personal relationships or supportive community). In contrast to the situation in J.M., in this case the superior court found that father had never played a significant role in J.Y.'s life and that J.Y. had been in state custody since January 2014, had been living since June 2015 with his brother in a supportive family that wanted to adopt him, and had never spoken to his adoptive family about father. The court's findings and conclusions concerning changed circumstances and the statutory best-interest factors support the court's termination order.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

4