VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      25-AP-353



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

APRIL TERM,   2026

In re I.G., Juvenile
(A.G., Father\*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Rutland Unit,
Family Division
CASE NO. 22-JV-01121
Trial Judge: Cortland Corsones

In the above-entitled cause, the Clerk will enter:

Father appeals from a family division order terminating his parental rights in his son I.G., born in June 2017.\*  We affirm.

The record reflects the following.  In July 2022, the State filed a petition alleging that I.G.—then five years old—was a child in need of care or supervision (CHINS).  At the time, father was incarcerated and I.G. was in mother's care.  The State alleged that mother's substance abuse and lack of engagement in treatment put I.G. at risk of harm.  The court transferred custody of I.G. to the Department for Children and Families (DCF) under a temporary-care order.

In September 2022, based on mother's stipulation, the trial court found that I.G. was CHINS at the time of the petition.  The following month, the court issued a disposition order adopting a case plan with a goal of reunification with either parent or both by May 2023. Father's action steps included: following his conditions of probation; engaging in a domestic-violence class and a parenting class; completing a mental-health assessment and following any resulting recommendations; attending supervised visits with I.G.; maintaining safe and stable housing; and signing all necessary releases so that DCF could track his progress toward these goals.  Neither party appealed the merits or disposition orders.

In January 2025, the State petitioned to terminate parents' rights in I.G.  The court held a hearing on the termination petition in September 2025.  It admitted several exhibits and heard

---

\* Mother's parental rights in I.G. were terminated in the same order; she did not appeal. We therefore focus here on the procedural background relevant to father's arguments on appeal.

testimony from father, the DCF caseworker, and I.G.'s foster mother. Based on the evidence presented, the court found the following facts by clear and convincing evidence.

Mother and father were never married, but resided together "off and on" following I.G.'s birth in June 2017. In 2018, father smashed the window of a car with I.G. inside, which resulted in I.G. receiving cuts to his leg. I.G. was placed in DCF custody between December 2019 and November 2020 in connection with a separate juvenile proceeding.

When I.G. returned to DCF custody in July 2022 in connection with the instant proceeding, father was incarcerated on a domestic-assault charge and mother was I.G.'s primary custodial parent. Custody was transferred to DCF because mother could not meet I.G.'s needs after relapsing in substance use and disengaging with treatment. DCF placed I.G. with the same foster family he had lived with during his earlier period in custody.

Father had been incarcerated for significant portions of I.G.'s life and had not resided with I.G. since I.G. was three years old. In November 2021, father was convicted of criminal charges of burglary, simple assault on a correctional officer, aggravated domestic assault, violation of conditions of release, aggravated assault, and domestic assault.

The disposition order described above was adopted in November 2022. DCF set up supervised visits for father, but by December 2022 the supervising organization discontinued father's visits because of father's failure to consistently participate.

Father did not regularly attempt to contact DCF or consistently provide the agency with his contact information. As a result, DCF had a difficult time maintaining contact with him. In April 2023, father reached out to DCF to restart his visits with I.G. DCF sent a second referral to the visit-supervision organization. Because father failed to follow through with the organization, visits were not set up.

Father was found to have violated the terms of his probation in December 2023.

Father reached out to DCF in April 2024 and left a voicemail. DCF returned the call and left a voicemail for father. In June 2024, father contacted DCF from the Valley Vista Treatment Center, where he was a patient. The caseworker reviewed father's action steps with him to ensure he understood the expectations. Given the amount of time that had elapsed since father had contact with I.G., DCF requested that father write a letter to I.G. to reintroduce himself and hopefully begin the process of re-starting visits. Father promptly wrote a letter which DCF provided to I.G. I.G. reacted very negatively to receiving the letter, temporarily setting back his progress and stability. The caseworker recommended that father write further letters to help the process. Father, however, did not write I.G. any more letters.

Shortly after father wrote his letter, he was discharged from Valley Vista. Prior to father's discharge, the DCF caseworker told father that he would need to provide her with his contact information upon discharge. She also requested that father call her after being discharged. Father neither provided the caseworker with updated contact information nor called her after being discharged from treatment. The caseworker attempted to reach father using the information on file. Although she called, wrote to, and texted father, she received no response.

In August 2024, father was again charged with violating the terms of his probation. At the time of the termination hearing, that violation remained pending.

2

Father was incarcerated in July 2025 and remained so at the time of the termination hearing. He did not tell the caseworker he had been reincarcerated, and she was unaware of his whereabouts until August 2025. The caseworker then attempted to call father at the facility, but learned that she would need to obtain a PIN pursuant to a new DOC procedure.

At the time of the termination hearing, father had made "no significant progress" on his case plan, which had then been in effect for almost three years. His last in-person contact with I.G. was a supervised visit in November 2022. The only other contact he had with I.G. since that time was the letter he sent while at Valley Vista. Although the case plan called for father to comply with his probation conditions, father was found to have violated his probation. Father did not sign releases to share information with DCF. He did not complete the required domestic-violence class, parenting class, or mental-health assessment. He had not maintained safe and stable housing, but instead had been "in and out of incarceration," while failing to keep DCF current on the resulting changes in his contact information. Although father loved and missed I.G., he had no knowledge of I.G.'s current needs.

I.G. had been in DCF custody for "two separate extended time periods." By the time of the termination hearing, I.G. was eight years old and had spent four of those years in the care of his foster family. They provided him with love, affection, and a safe, stable environment. I.G. was well-adjusted to their home and his school. They considered him family and wished to provide him with permanency. I.G., in turn, considered himself a member of their family and wanted to continue living with them.

The court also made the following findings in response to father's argument that DCF had not made reasonable efforts to implement the case plan. DCF tried, in good faith, to reach out to father on a regular basis using the contact information they had, but were unable to reach him. They also reminded father of the need to provide updated contact information when they were able to speak with him at Valley Vista in June 2024, but he failed to do so following his discharge. To the extent DCF was unable to maintain communication with father in accordance with its own contact guidelines, this failure was due to father's unwillingness to provide DCF with the necessary contact information and his own failure to regularly contact DCF.

As discussed in greater detail below, based on these findings, the court concluded that there had been a change in circumstances arising from father's stagnation and that termination of father's parental rights was in I.G.'s best interests. The court therefore issued an order terminating father's residual parental rights in I.G. This appeal followed.

Where a petition to terminate parental rights is filed after disposition, the family court undertakes a two-step analysis. In re D.S., 2016 VT 130, ¶ 6, 204 Vt. 44; 33 V.S.A. § 5113(b). First, the court must determine whether "a change in circumstances requires such action to serve the best interests of the child." 33 V.S.A. § 5113(b). Changed circumstances are "most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time." In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517 (mem.) (quotation omitted). Where this threshold is met, the court goes on to consider whether termination is in the child's best interests under the four statutory criteria at 33 V.S.A. § 5114(a). The "most important" of these factors is the third, which calls for the court to consider the likelihood that the parent will be able to resume or assume parental duties within a reasonable period. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325; see 33 V.S.A. § 5114(a)(3).

"The State has the burden of proof at both stages and, as to each point, must meet its burden by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108

(quotation omitted). The decision to terminate parental rights, however, "is committed to the discretion of the family court." In re D.M., 162 Vt. 33, 38 (1994). Provided the court applied the proper standard, we will not disturb its findings unless clearly erroneous and will affirm its conclusions if supported by those findings. In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, father argues that the court erred at both stages of the analysis because it rested its conclusions on factors beyond his control—namely, he asserts, DCF's failure to make reasonable efforts to support reunification. As we have previously explained in response to similarly framed arguments, the reasonable-efforts determination required by 33 V.S.A. § 5321(h) is separate from the decision to terminate parental rights, "and the former is not a prerequisite to the latter." In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29. That said, "[t]he reasonableness of DCF's efforts to promote reunification may be relevant to whether a parent's progress has stagnated," In re D.F., 2018 VT 132, ¶ 49, 209 Vt. 272, because the court cannot base a conclusion of changed circumstances "on stagnation caused by factors beyond a parent's control," In re D.M., 162 Vt. 33, 38 (1994). We have likewise recognized that "the level of assistance provided to parents" is relevant to determining whether a parent is likely to be able to resume parental duties within a reasonable time, see 33 V.S.A. § 5114(a)(3), although "the extent of DCF's efforts to achieve the permanency plan is not one of the best-interests factors to be considered at termination." In re N.L., 2019 VT 10, ¶ 27 (quotation and brackets omitted). Thus, "the same evidence may be relevant to both the reasonable-efforts determination and the termination decision," though these two inquiries "present distinct issues." In re D.F., 2018 VT 132, ¶ 49.

With this understanding, we take up father's contentions on appeal. As detailed above, the trial court explicitly addressed father's argument that DCF failed to make reasonable efforts in its termination order. It concluded that DCF tried, in good faith, to contact father on a regular basis, but was stymied in this effort by father's unwillingness to provide the agency with his updated contact information or to regularly contact DCF himself. Father appears to challenge this finding as clearly erroneous, arguing first that the court overlooked evidence pertaining to DCF's efforts to contact him during his most recent period of incarceration. Because we "leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence," when findings are attacked on appeal, this Court's "role is limited to determining whether they are supported by credible evidence." In re A.F., 160 Vt. 175, 178 (1993).

At the outset, we note that although the case plan took effect in November 2022, father's challenge pertains only to DCF's efforts to contact him during the two-month period between his July 2025 reincarceration and the September 2025 termination hearing. He does not attack the court's finding that he was responsible for his lack of contact with DCF earlier in the case. In any event, our review of the evidence admitted regarding this two-month period does not undermine the court's conclusion that father's failure to maintain contact with DCF is not attributable to any failure of reasonable efforts on the part of the agency.

It is undisputed that, at the time of the September 2025 termination hearing, father had been incarcerated since July 2025. The caseworker testified to the following. Father did not reach out to inform her that he had been reincarcerated, and she did not learn of this until August 2025. She could have subsequently attempted to visit father at the facility, but did not. She did, however, attempt to call father after learning of his incarceration. Upon doing so, she was informed of a new, mandatory policy requiring DCF workers to obtain an attorney's PIN to contact incarcerated parents. At this point, the caseworker followed the process necessary to

obtain a PIN. She received the PIN number on "Tuesday of this week," but had yet to call father at the time of the Friday termination hearing. Father, for his part, testified that while incarcerated, he is able to write letters and place calls to people outside the facility.

This evidence does not demonstrate that the challenged finding is clearly erroneous. The caseworker had asked father to keep her informed of any changes in his contact information, but he failed to inform her that he had been reincarcerated. Although the caseworker later learned of this independently, father does not explain how any call placed in the days prior to the hearing after obtaining the PIN—or even a visit to him in the facility a month prior—could meaningfully impact the court's assessment of father's responsibility for his failure to maintain contact with DCF during the almost three-year period the case plan was in place. The court's finding regarding DCF's reasonable efforts—to the extent it bore on its assessment of the termination petition—was not clearly erroneous.

Father also argues that the court overlooked evidence that DCF failed to make reasonable efforts to reinitiate his visits with I.G. He contends that, had DCF engaged I.G. with a therapist following his negative reaction to father's letter, this might have helped to restart visits.

The evidence in the record about the letter and the agency's considerations regarding therapy does not undermine the court's broader finding that DCF made reasonable efforts to support reunification. The caseworker offered the following testimony on this issue. When father contacted the agency from Valley Vista in June 2024, he asked what he could do to resume contact with I.G. After discussing this with her supervisor, the caseworker asked father to write a letter to I.G. DCF required this as a condition of reinitializing in-person visits because of the amount of time that had gone by since father and I.G. had seen one another, and due to I.G.'s hesitancy to have contact with father. I.G. had a "negative reaction" to father's letter. I.G.'s response also suggested that he might be unsure of who father was. The caseworker thought I.G.'s reaction was likely to be different upon receiving a second or third letter from father. Although DCF wanted father to send "at least one or two more" letters to I.G. before resuming in-person contact, father never sent I.G. another letter. DCF and the foster family initially discussed therapy for I.G. in order to facilitate the resumption of in-person visits following his reaction to the initial letter, but ultimately determined that it was unnecessary after I.G.'s mental state "balanced back out again." When asked why DCF did not have I.G. participate in therapy so that he would be more receptive to receiving letters, the caseworker responded that she believed that had subsequent letters been sent, "things could have been different." She explained that the letters were intended to ease I.G.'s anxiety, and also to demonstrate to I.G. that father was going to follow through with writing them before attempting in-person contact.

In reviewing father's argument on this point, we first observe that he does not dispute that he was responsible for the lack of contact that eroded his relationship with I.G. to the point where some form of reintroduction was necessary prior to restarting visits. He does not challenge the court's findings that his supervised visits were discontinued in December 2022 because of his failure to attend consistently, or that DCF attempted to reinitiate supervised visits at father's request in April 2023, but this did not occur due to father's failure to follow through with the supervising organization. Implicit in the court's conclusion is the determination that requiring father to send one or two more letters to I.G. was a reasonable condition DCF placed on the resumption of visits. Father had the ability to send these letters, but the court found that he did not do so. Father's speculative assertion that engaging I.G. in therapy would have

facilitated the resumption of contact does not render the court's finding that DCF made reasonable efforts to support reunification clearly erroneous.

Having concluded that the court's findings with regard to DCF's efforts are not clearly erroneous, we turn to father's related challenges to the court's conclusions that there had been a change in circumstances and that termination of father's parental rights was in I.G.'s best interests.

With respect to changed circumstances, the court observed that, in addition to being a "virtual stranger" to I.G. due to his lack of contact, father had made "no significant progress" on his case plan, even though his action steps had been in place for almost three years. It explained that father was not aware of I.G.'s current needs, remained unable to provide him with a safe and stable living environment, and remained at risk of further or ongoing incarceration in connection with his pending probation-violation charge. For all of these reasons, the court concluded, father was "no closer to the goal of reunification with I.G. than he was when the case plan was implemented" almost three years earlier. The court did not abuse its discretion in thus finding changed circumstances based on father's stagnation. As we have recognized, "[s]tagnation may be found when the parent has not made the progress expected in the plan of services . . . despite the passage of time." In re D.S., 2016 VT 130, ¶ 6, 204 Vt. 44 (quotation omitted). Nor has father demonstrated that the finding of stagnation was impermissibly based on factors beyond his control. As discussed above, father had numerous opportunities to engage with DCF and to pursue in-person visitation with I.G. Although his incarceration may have limited some of these opportunities, "our case law makes clear that a parent is responsible for the behavior that leads to incarceration and the consequences that come with such incarceration." In re D.S., 2014 VT 38, ¶ 26, 196 Vt. 325 (collecting cases); see, e.g., In re K.F., 2004 VT 40, ¶ 12, 176 Vt. 636 (explaining that termination of father's parental rights not based on factors beyond father's control and observing that father bore "sole responsibility" for frequent incarceration, failure to maintain consistent contact with caseworker, and lack of bond with child).

The same principles apply to the court's assessment of the best-interests factors. Father was responsible for his incarceration and his failure to follow through with the modest letter-writing condition DCF imposed on the resumption of visits. The court appropriately considered his failure to do so in analyzing his fitness pursuant to the statutory standard. See, e.g., In re D.S., 2014 VT 38, ¶ 26.

Father has not otherwise identified error in the court's weighing of the best-interests factors. With respect to the "most important" factor—the likelihood that the parent will be able to resume or assume parental duties within a reasonable period from the perspective of the child's needs—the court noted the lengthy periods I.G. had already spent in DCF custody and found that he had an immediate need for permanency. In re C.P., 2012 VT 100, ¶ 30. Father, however, remained "very far away from reunifying with I.G." and would be "starting from scratch today" if he were to begin engaging with the case plan. It was unknown when, or if, he would be able to meet I.G.'s need for permanency. The court also observed that I.G. was "very bonded" with his foster family, with whom he had resided for over half his life, and that his foster family wanted to provide I.G. with permanency. For these and other reasons, the court concluded that all four factors weighed in favor of termination.

Father contends only that this analysis reflects a failure to evaluate I.G.'s best interests in the context of the legislative purposes underlying Vermont's Juvenile Proceedings Act. The Legislature specified that the Act should be construed to, among other things, "preserve the

6

family and to separate a child from his or her parents only when necessary to protect the child from serious harm or in the interests of public safety;" "ensure that safety and timely permanency for children are the paramount concerns in the administration and conduct of proceedings;" and "to achieve the foregoing purposes, whenever possible, in a family environment, recognizing the importance of positive parent-child relationships to the well-being and development of children." 33 V.S.A. § 5101(a)(3)-(5). As we have recognized, however, "the best interests of the child remains the touchstone and the court's paramount concern in a termination-of-parental-rights proceeding," In re J.M., 2015 VT 94, ¶ 12, 199 Vt. 627 (quotations omitted), and "the court is not obligated to 'preserve the family' at the expense of a child's best interests." In re D.S., 2014 VT 38, ¶ 31, 196 Vt. 325. The court correctly focused on I.G.'s best interests here and determined that they required the termination of father's parental rights. Although father may believe a different result was warranted, he has not demonstrated that the court abused its discretion.

Father has not identified any basis to disturb the family division's order terminating his parental rights in I.G.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Michael P. Drescher, Associate Justice

7